UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF STERLING HEIGHTS GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> HOSPIRA, INC., F. MICHAEL BALL, THOMAS E. WERNER and CHRISTOPHER B. BEGLEY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case Number: <br><br> <u>CLASS ACTION</u> <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Hospira, Inc. ("Hospira" or the "Company") between March 24, 2009 and October 17, 2011 (the "Class Period"), against Hospira and certain of its officers and/or directors for violations of the Securities and Exchange Act of 1934 ("1934 Act"). These claims are asserted against Hospira and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the Securities and Exchange Commission ("SEC").

2.      Hospira is a global specialty pharmaceutical and medication delivery company. The Company's portfolio includes over 200 generic injectable products in multiple dosages and formulations, as well as integrated infusion therapy and medication management systems. Hospira's products are used by hospital and alternative site providers, such as clinics, home healthcare providers and long-term care facilities. The Company operates in three segments: (1) the Americas; (2) Europe, the Middle East and Africa ("EMEA"); and (3) the Asia Pacific ("APAC"). Each of the Company's three operating segments reports results for three product lines: Specialty Injectable Pharmaceuticals (generic injectables and proprietary specialty injectables), Medical Management (infusion pumps, related software, services, dedicated administration sets, gravity administration sets, and other device products), and Other Pharmaceuticals (large volume I.V. solutions, nutritionals and contract manufacturing services).

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's financials and business prospects. Specifically, the Company touted to investors Hospira's ability to streamline its process and practices in order to boost the Company's long-term profitability and increase the return for Hospira shareholders.

4.      At the start of the Class Period, defendants touted the Company's Project Fuel campaign, which was designed to optimize Hospira's operations and increase shareholder value. Specifically, the project was intended to improve Hospira's margins, fuel growth, and improve operational and manufacturing efficiency.  Project Fuel also contemplated significant upgrades in information technology.  But, what defendants omitted and misrepresented in their Class Period statements was that the Company was beset by myriad manufacturing deficiencies and a host of design failures in its critical infusion pump business.  The result of the foregoing was that the Company received two "Warning Letters" from the U.S. Food and Drug Administration ("FDA") and faced an abnormal level of regulatory scrutiny that substantially threatened its current and future financial results and business prospects.  Although the Company disclosed the existence of the Warning Letters, defendants misled the market as to the extent of the Company's failures, instead continuing to tout growing revenues, earnings per share, and profit margins.

5.      Then, on October 18, 2011, the Company announced disappointing preliminary third quarter financial results and slashed full-year guidance, pointing to a production disruption at its Rocky Mount, North Carolina manufacturing plant, which accounted for approximately 25% of the Company's sales.  The Company attributed the production slowdown, which caused lost sales as the percentage of customer orders met by Hospira "fell from the mid 90s to the high 80s," to the impact of an ongoing FDA investigation.

6.      The result of the Company's surprisingly negative results was a 21% drop in the price of Hospira common stock, which fell $7.85 per share to close at $29.51 per share on October 18, 2011.

7.      Following the close of the Class Period, on October 26, 2011, the Company revealed additional negative news.  After reporting its third quarter 2011 financial results, the Company hosted a conference call.  During the call, Hospira estimated that its remediation costs would be

between $300 million and $375 million over three years, that the Company was seeing "bottlenecks" at its Rocky Mount plant, and that the Company remained unable to lay out remediation deadlines. The Company also revealed that it had broadened the scope of its remediation investigation to look at all of its plants, that the FDA was examining the Company's Austin, Texas plant, which accounted for approximately 10% of the Company's sales, and that "the FDA is likely not only just withholding approval to products coming out of Rocky [Mount], but are most likely doing the same at Austin."

8.      The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

(a)      Hospira suffered from extensive quality control issues throughout the Class Period, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel;

(b)      Defendants failed to disclose the extent of the Company's inability to comply with problems identified in FDA Warning Letters related to Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses;

(c)      Hospira's revenue guidance for 2010 and 2011 was misstated and lacked a reasonable basis when made; and

(d)      As a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

9.      As a result of defendants' false statements, Hospira's common stock traded at inflated levels during the Class Period.  After the above revelations seeped into the market, the price of Hospira shares was hammered by massive sales, sending it down more than *50%* from its Class Period high.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

11.     Venue is proper in this District pursuant to §27 of the 1934 Act.  The violations of law complained of herein occurred in part in this District, including the dissemination of materially false and misleading statements complained of herein into this District.  Hospira's principal executive offices are located at 275 North Field Drive, Lake Forest, Illinois 60045.

12.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.  Hospira's stock trades in an efficient market on the New York Stock Exchange ("NYSE").

## PARTIES

13.     Plaintiff City of Sterling Heights General Employees' Retirement System ("Plaintiff") purchased Hospira common stock as described in the attached certification and was damaged thereby.

14.     As stated above, Hospira is a provider of injectable drugs and infusion technologies and is located in Lake Park, Illinois.  Hospira was incorporated in Delaware on September 16, 2003, as a wholly owned subsidiary of Abbott Laboratories ("Abbott").  Hospira's business first began operation as part of Abbott in the 1930s.  As part of a plan to spin off its core hospital products business, Abbott transferred the assets and liabilities relating to Hospira's business to Hospira and, on April 30, 2004, distributed Hospira's common stock to Abbott's shareholders.  On that date, Hospira began operating as an independent company, and on May 3, 2004, Hospira's common stock began trading on the NYSE under the symbol "HSP."

15.     Defendant F. Michael Ball ("Ball") is, and has been Chief Executive Officer ("CEO") of Hospira since March 28, 2011.  Additionally, Ball has served as a Director of the Board since his appointment in March 2011.

16.     Defendant Thomas E. Werner ("Werner") is, and at all relevant times was the Chief Financial Officer ("CFO") and Senior Vice President of Finance of Hospira.  During the Class Period, while Hospira common stock was artificially inflated, Werner sold 85,849 shares of his Hospira common stock at prices ranging between $53.71 and $59.50 per share for insider trading proceeds of more than $4.9 million.

17.     Defendant Christopher Begley ("Begley") is, and at all relevant time was the Executive Chairman of the Board of Hospira.  Begley also served as the Company's CEO until Ball's appointment on March 28, 2011.  During the Class Period, while Hospira common stock was artificially inflated, Begley sold 386,112 shares of his Hospira common stock at $57.00 per share for insider trading proceeds of more than $22 million.

18.     Defendants Ball, Werner, and Begley (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Hospira's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

19.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Hospira. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Hospira common stock was a success, as it: (i) deceived the investing public regarding Hospira's prospects and business; (ii) artificially inflated the prices of Hospira common stock; and (iii) caused Plaintiff and other members of the Class to purchase Hospira common stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Hospira common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Hospira has more than 164 million shares of stock outstanding, owned by hundreds if not thousands of persons.

22.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of Hospira common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

23.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

24.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

25.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

26.     The Class Period starts March 24, 2009.  On that date, the Company issued a press release entitled "Hospira Announces Plans to Optimize Operations, Increase Shareholder Value." The press release stated, in part:

> *Hospira, Inc. (NYSE: HSP), a leading global specialty pharmaceutical and medication delivery company, today announced details regarding Project Fuel, a multi-phased initiative to improve the company's margins and fuel its growth. Project Fuel will capitalize on the company's potential to increase shareholder value and improve operational efficiency by optimizing its product line, evaluating non-strategic assets and streamlining its organizational structure.*

> In conjunction with these actions, which are slated to occur over the next 24 months, Hospira expects to reduce its global workforce by approximately 10 percent and deliver annual cost savings of approximately $110 million to $140 million.

*"To maximize our opportunities for growth and sustainable shareholder value, Hospira is taking a number of important steps to simplify our business, strengthen our financial position and establish a strong foundation for our future,"* said Christopher B. Begley, chairman and chief executive officer, Hospira. *"By reducing costs and improving efficiencies, we can free up more dollars to invest for profitable growth and shareholder returns. And with a streamlined, focused organization, we will reduce complexity, improve performance and be better positioned to advance our significant opportunities."*

\* \* \*

Financial information

In connection with these actions, Hospira estimates it will incur total pre-tax charges in the range of $140 million to $160 million, of which approximately $90 million to $100 million will be incurred during 2009. The total charges for the project include cash costs of approximately $120 million, primarily related to restructuring costs, including employee-separation and other costs, as well as process optimization implementation costs. Approximately $30 million of non-cash costs is related to various potential asset write-downs. *Hospira expects these actions will deliver annualized pre-tax savings of approximately $8 million to $10 million in 2009 and approximately $110 million to $140 million on an annualized run-rate basis, which it expects to reach by the second quarter of 2011.*

27. The market reacted positively to the Company's announcement, with the price of Hospira common stock reaching a high of $28.86 before closing at $28.28 per share on March 24, 2009, a 7.4% increase over the closing price on March 23, 2009. The following day, March 25, 2009, as analysts from Leerink Swann & Co. raised Hospira to "outperform," the stock price continued to climb, rising an additional 5.6% to close at $29.86.

28. On April 28, 2009, the Company issued a press release reporting its first quarter financial results for the three months ended March 31, 2009. The press release stated, in part:

Net sales for the quarter were $860 million, and adjusted* diluted earnings per share were $0.60. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"Hospira delivered on its commitments in the first quarter, generating solid sales and earnings growth in a period marked by continued economic uncertainty," said Christopher B. Begley, chairman and chief executive officer. *"Looking forward, we believe the results of our strategic investments and our focus on execution position us well to deliver our financial commitments for 2009. In addition, we are driving*

- 9 -

> *operational excellence through our optimization initiatives under Project Fuel,*
> *which will create long-term, sustainable growth and increased shareholder value.*"

*      *      *

> Net sales decreased 3.3 percent to $860 million in the first quarter of 2009, compared
> to $889 million in the first quarter of 2008.  Growth in Other Pharma in the Americas
> segment and *solid overall performance in Medication Management Systems*
> *(MMS), mainly a function of continued penetration of Symbiq®*, were offset by
> unfavorable foreign currency translation and continued pricing pressure in Specialty
> Injectable Pharmaceuticals (SIP) in the Europe, Middle East and Africa (EMEA)
> segment.

> Adjusted* operating income increased 3.2 percent to $150 million in the first quarter
> of 2009, compared to $145 million in the first quarter of 2008.  *Driving the majority*
> *of the increase was improved manufacturing efficiency*, with a contribution from
> favorable volume/mix.

29.      Also on April 28, 2009, the Company filed with the SEC its quarterly report on Form

10-Q for the three months ended March 31, 2009.  The Company's Form 10-Q reiterated the

Company's financial results, was signed by Werner, and contained required Sarbanes-Oxley

("SOX") certifications signed by Werner and Begley.  The Form 10-Q stated, in part:

> *In March 2009, Hospira announced details to a multi-stage restructuring and*
> *optimization plan ("Project Fuel") which will occur over the next two years*.
> Project Fuel includes the following activities: optimizing the product portfolio,
> evaluating non-strategic assets, and streamlining the organizational structure.
> Hospira expects to incur aggregate restructuring charges through 2011 related to
> these actions in the range of $100 million to $110 million on a pre-tax basis.  During
> the three months ended March 31, 2009 Hospira incurred, primarily in the Americas
> segment, pre-tax restructuring costs of $4.7 million.

*      *      *

> Net sales in the Americas segment increased 1.6%, or 3.9% excluding the impact of
> changes in foreign exchange rates . . . .  *Net sales in Medication Management*
> *Systems increased due to solid penetration, particularly for Symbiq®, Hospira's*
> *newest general infusion system.*  Other Devices net sales decreased due to price and
> the impact of changes in foreign exchange rates, partially offset by volume growth in
> gravity administration sets.

30.      On July 29, 2009, the Company issued a press release reporting its second quarter

financial results for the three months ended June 30, 2009.  The press release stated, in part:

- 10 -

Net sales for the quarter were $957 million, and adjusted* diluted earnings per share were $0.73. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"***Hospira delivered a very good second quarter, marked by strong sales and earnings, and significant progress toward our Project Fuel initiatives,***" said Christopher B. Begley, chairman and chief executive officer. "***Based on our results for the first half of the year and our expectations for the remainder of 2009, we have increased our full-year adjusted earnings guidance. We remain committed to improving shareholder value through sustainable top- and bottom-line growth.***"

31. Also on July 29, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the three months ended June 30, 2009. The Company's Form 10-Q reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Begley. The Form 10-Q stated, in part:

*In March 2009, Hospira announced details of a multi-stage restructuring and optimization plan ("Project Fuel") which will occur over the next two years.* Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets, and streamlining the organizational structure. Hospira expects to incur aggregate restructuring costs and other asset charges, over the next two years, related to these actions in the range of $100 million to $110 million on a pre-tax basis. During the three and six months ended June 30, 2009 Hospira incurred, primarily in the Americas segment, pre-tax Restructuring costs of $4.4 million and $9.1 million, respectively. Inventory charges of $1.7 million related to product portfolio optimization, primarily impacting the Americas segment, are included in Cost of products sold during the three and six months ended June 30, 2009.

\*      \*      \*

Net sales in the Americas segment increased 11.0%, or 12.9% excluding the impact of changes in foreign exchange rates . . . . *Net sales in Medication Management Systems decreased due to lower large volume infusion system sales, which in 2008 included higher volumes, particularly for Symbiq®, due to improvements in the implementation process, offset by increased volume for administration sets.*

32. On August 12, 2009, the FDA issued a Warning Letter to Hospira, which the Company received on August 13, 2009. On August 14, 2009, the Company summarized the FDA Warning Letter in a press release. The press release, which did not attach a copy of the August 12, 2009 Warning Letter, stated, in part:

[The letter] related to the Company's corrective action plans with respect to the failure of certain AC power cords manufactured by a third party. The affected power cords are used on certain of the Company's infusion pumps and related products. The Company takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's warning letter. There can be no assurance that the FDA will be satisfied with the Company's response. The Company is initiating a voluntary recall of the affected power cords.

*The Company does not expect either of these events to adversely impact the Company's ability to achieve the 2009 financial projections communicated with the second quarter 2009 earnings release.*

33. The August 12, 2009 Warning Letter, a true and correct copy of which is attached hereto as ***Exhibit A***, stated that the FDA conducted an inspection at Hospira's Morgan Hill, California facility on April 21, 2009 through May 22, 2009. The result of the investigation revealed adulterations in the Company's infusion pumps – including the Plum Family line, LifeCare PCA3, and Symbiq pumps – because the "methods used in, or the facilities or controls used for, their manufacture, storage, or installation" were "not in conformity with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System (QS) regulation. . . ." Among other things, the August 12, 2009 Warning Letter stated that Hospira's violations included a "[f]ailure to identify the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems." The letter stated the Company had previously created a "Correct and Preventative Action report" to "investigate reports of failing AC power cords," but that the Company "continue[d] to distribute the old AC power cords as replacement parts." The August 12, 2009 Warning Letter also identified the "following reports of failures involving the old AC power cords":

- On [redacted] a user filed a report of flames discarding from the Plum 1.6 pump, 8-12 inches in height. No injury was reported for this event. This event was to you through your internal complaint handling system, [redacted]

- On July 5, 2008, a user sustained electric stock from your Plum XLMD Pump and required medical treatment. Your firm reported this event to the FDA on October 16, 2008 under MDR Number 2921482-2008-00337.

- On June 3, 2008, a user received electrical stock from your Plum A+ Pump and required medical treatment. Your firm reported this event to the FDA on June 30, 2008 under MDR Number 2921482-2008-00201.

34.     Continuing, the redacted August 12, 2009 Warning Letter stated, in part:

During our inspection, no documents were provided to the FDA investigator to demonstrate that a new [Risk Priority Number ("RPN")] was generated based upon a re-evaluation of reported complaints associated with old AC power cords received after [redacted] as required by your firm's procedure. By failing to generate an updated RPN for the AC power cord issue, your firm failed to determine whether additional corrective and preventive action is warranted to address the continuous shipment of the old AC power cord design.

We have reviewed your response to the FDA-483 Inspectional Observations in which your firm states that [redacted] will be required to assure that corrections are adequate.

35.     The August 12, 2009 Warning Letter required Hospira to respond in writing within fifteen business days from date of receipt with "specific steps . . . taken to correct the noted violations, including an explanation of how [Hospira planned] to prevent these violation(s), [or] similar violation(s) from occurring again." The FDA also required Hospira to provide documentation of the correction action Hospira had taken.

36.     The market, however, did not react to the Company's release disclosing the August 12, 2009 FDA Warning Letter. Defendants' statements regarding the warning letter omitted critical information regarding the true extent of the Company's problems. Indeed, by April 2010, Hospira would have to withhold shipments of the Symbiq infusion pump. Further, the defendants' limited statements omitted that there were substantial quality control deficiencies looming at Hospira, not only with its infusion pumps, but within its pharmaceutical business, that would significantly and negatively impact the Company's financial performance and future business prospects.

37.     On October 27, 2009, the Company issued a press release reporting its third quarter financial results for the three months ended September 30, 2009. The press release stated, in part:

Net sales for the quarter were $1.0 billion, and adjusted* diluted earnings per share were $0.90. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"*Hospira delivered strong results in the third quarter, aided by the launch of the generic oncolytic oxaliplatin and additional progress toward our Project Fuel initiatives*," said Christopher B. Begley, chairman and chief executive officer. "*We continued to position Hospira for future success in this milestone quarter, during which we surpassed the billion dollar revenue mark for the first time and generated strong double-digit earnings per share growth. We remain confident in our projections for full-year sales and are increasing our earnings per share guidance.*"

\* \* \*

Net sales increased 8.9 percent to $1.0 billion in the third quarter of 2009, compared to $926 million in the third quarter of 2008. The growth was driven by an increase in Specialty Injectable Pharmaceuticals, primarily a result of the third-quarter launch of oxaliplatin in solution form in the United States.

Adjusted* income from operations increased 28.3 percent to $207 million in the third quarter of 2009, compared to $162 million in the third quarter of 2008. *Driving the majority of the increase were higher sales volumes and increased manufacturing efficiency. Partially offsetting these factors was the impact of certain product recall-related costs* as well as the impact of foreign exchange.

38.     Also on October 27, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the three months ended September 30, 2009. The Company's Form 10-Q reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Begley. The Form 10-Q stated, in part:

*In March 2009, Hospira announced details of a multi-stage restructuring and optimization plan ("Project Fuel") which will occur over the next two years.* Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets, and streamlining the organizational structure. Hospira expects to incur aggregate restructuring costs and other asset charges, over the next two years, related to these actions in the range of $100 million to $110 million on a pre-tax basis. During the three and nine months ended September 30, 2009 Hospira incurred, primarily in the Americas segment, pre-tax Restructuring costs of $5.7 million and $14.8 million, respectively. During the three and nine months ended September 30, 2009, inventory charges of $7.8 million and $9.5 million, respectively, related to product portfolio optimization, primarily impacting the Americas segment, are included in Cost of products sold.

\* \* \*

*On August 13, 2009, Hospira received a Warning Letter, dated August 12, 2009, from the United States Food and Drug Administration ("FDA") related to Hospira's corrective action plans with respect to the failure of certain AC power cords manufactured by a third party. The affected power cords are used on certain infusion pumps and related products. Hospira initiated a voluntary recall of the affected power cords in August 2009. Hospira has responded to the Warning Letter and is working closely with the FDA to conclude this matter.* Hospira cannot, however, give any assurances as to the expected date of resolution of the matters included in the Warning Letter. While Hospira continues to work to resolve the remaining matters described above, there can be no assurance that additional costs or penalties will not be incurred, and that additional regulatory actions with respect to Hospira will not occur.

Hospira recognized costs related to the voluntary recall of the AC power cords and certain other products during the three months ended September 30, 2009. Hospira has initiated field corrections and other remediation activities with respect to the recalled products. It is possible that additional costs related to these recalls may be required in future periods, based on modifications to the current remediation plans and changes in estimates as a result of ongoing dialogue with the FDA.

*     *     *

Net sales in the Americas segment increased 13.8%, or 14.6% excluding the impact of changes in foreign exchange rates . . . . *Net sales in Medication Management Systems were slightly higher with volume increases in large volume infusion systems, primarily Plum A+®, and ambulatory systems.*

*     *     *

Gross profit, Net sales less Cost of products sold, increased $61.8 million, or 18.5%, for the three months ended September 30, 2009, compared with the same period in 2008.

*The gross profit increase is primarily the result of higher sales volume and favorable product mix including the U.S. product launch of generic oxaliplatin and manufacturing efficiency gains associated with Project Fuel, partially offset by the impact of certain product recall related costs* and changes in foreign exchange.

39.     On November 6, 2010, the Company issued a nationwide, voluntary recall of certain lots of its liposyn and propofol products because they could contain "particulate matter." In a release to the market, *which indicated that Hospira had identified the "root cause" of the problem and implemented "corrective actions,"* the Company stated, in part:

- 15 -

Hospira, Inc. (NYSE: HSP), a global specialty pharmaceutical and medication delivery company, is voluntarily recalling 85 lots of Liposyn™ II 10%, Liposyn II 20%, Liposyn III 10%, Liposyn III 20%, Liposyn III 30% and 73 lots of Propofol Injectable Emulsion 1% products that begin with the lot numbers 79 and 80 because some of the containers may contain particulate matter. ***The source of the particulate matter has been identified as stainless steel equipment used in the manufacturing process. The affected lots were distributed between July 2009 and October 2009, and no other lots are affected by this recall.***

Hospira is undertaking this recall in consideration of the potential for safety issues if the products are administered to patients. Since these particulate contaminants do not dissolve in blood they could potentially act as emboli and impede blood flow. Particulates may also cause mechanical damage to the body and may escalate damage through the Systemic Inflammatory Response Syndrome (SIRS). Restriction in blood supply to tissues could lead to stroke, respiratory failure, kidney failure, liver failure, heart attack and/or death.

Hospira has not received any reports of adverse events related to this issue. ***Hospira has identified the root cause and corrective actions have been implemented.*** Hospira has made the U.S. Food and Drug Administration (FDA) aware of the situation.

40. On February 4, 2010, the Company issued a press release reporting its fourth quarter and full-year financial results for the three and twelve months ended December 31, 2009. The press release stated, in part:

For the fourth quarter of 2009, net sales were $1.1 billion, and adjusted* diluted earnings per share were $0.87. For the full year of 2009, net sales were $3.9 billion, and adjusted* diluted earnings per share were $3.11. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"***Driven by double-digit revenue and adjusted earnings growth, the fourth quarter concluded a year of transformation for Hospira. In addition to our strong financial performance, we made significant progress on many fronts, including augmenting our biogenerics program, launching a generic version of a blockbuster oncology drug, and advancing Project Fuel, our corporate-wide optimization initiative,***" said Christopher B. Begley, chairman and chief executive officer. "***Looking forward, we expect 2010 to be another good year of growth for Hospira. Backed by our commitment to strong execution and focus on sustained operational improvement, we continue to position Hospira for sustainable, long-term growth and increased shareholder value.***"

\*       \*       \*

- 16 -

Net sales increased 15.5 percent to $1.1 billion in the fourth quarter of 2009, compared to $914 million in the fourth quarter of 2008. The growth was driven mainly by an increase in Specialty Injectable Pharmaceuticals, primarily a result of the third-quarter 2009 launch of the generic chemotherapy agent oxaliplatin in solution form in the United States and strength in our proprietary sedation agent, Precedex™.

*Adjusted\* income from operations increased 8.5 percent to $204 million in the fourth quarter of 2009*, compared to $188 million in the fourth quarter of 2008. *Driving the majority of the increase were* higher net sales, more favorable product mix and *improvements resulting from the company's Project Fuel optimization initiatives*.

\*     \*     \*

Net sales increased 6.9 percent to $3.9 billion for the year ended Dec. 31, 2009, compared to $3.6 billion for the prior year. The growth was driven mainly by Specialty Injectable Pharmaceuticals, with strong growth from the U.S. launch of oxaliplatin and strength in Precedex.

*Adjusted\* income from operations increased 14.0 percent to $738 million for the full year of 2009, compared to $647 million for the full year of 2008. Higher net sales volume and increased manufacturing efficiency, including the impact of Project Fuel optimization initiatives, were the major drivers of the full-year operating income performance. Partially offsetting these factors were the impact of costs associated with certain product corrective actions*, as well as foreign exchange rate fluctuations.

\*     \*     \*

"The significant momentum we generated in 2009 has paved the way for continued progress in 2010," said Begley. "*With our* robust product pipeline, *anticipated advancements in* both Specialty Injectable Pharmaceuticals and *Medication Management Systems, combined with our focus on operational optimization through Project Fuel, Hospira is on track for another good year.*"

41.     On February 18, 2010, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2009. The Company's Form 10-K reiterated the Company's financial results, was signed by Begley and Werner, and contained required SOX certifications signed by Werner and Begley. The Form 10-K stated, in part:

As of December 31, 2009, Hospira operated 13 manufacturing facilities globally. Hospira's principal manufacturing facilities are identified in Item 2 of this report. *Hospira's largest facilities, located in Rocky Mount, North Carolina*; Austin, Texas; LaAurora, Costa Rica; McPherson, Kansas; and Mulgrave, Victoria,

Australia, ***account for a significant portion of Hospira's manufacturing output***. While Hospira has not experienced a significant interruption of manufacturing at those facilities, such an interruption could materially and adversely affect Hospira's ability to manufacture and sell its products.

\* \* \*

Hospira has developed and implemented quality systems and concepts throughout its organization. Hospira is actively involved in setting quality policies and managing internal and external quality performance. Its quality assurance department provides quality leadership and supervises its quality systems. An active audit program, utilizing both internal and external auditors, monitors compliance with applicable regulations, standards and internal policies. In addition, Hospira's facilities are subject to periodic inspection by the FDA and other regulatory authorities. ***Hospira has received notices from regulatory authorities alleging violations of applicable regulations and standards, and Hospira has developed definitive action plans, implemented remedial programs and modified its practices to address these issues***. During 2009, Hospira received a warning letter from the FDA related to Hospira's corrective action plans with respect to the failure of certain AC power cords manufactured by a third party. The affected power cords are used on certain infusion pumps and related products. Hospira initiated a voluntary recall of the affected power cords in August 2009. ***Hospira has responded to the warning letter and is working closely with the FDA to conclude this matter. Hospira initiated other voluntary recalls of certain other products and initiated field corrections and other remedial actions with respect to those products. Hospira continues to have an ongoing dialogue with the FDA. These matters have not materially impacted Hospira's ability to market and sell its products***.

\* \* \*

***In March 2009, Hospira announced details of Project Fuel which will occur over the next two years from the date of announcement***. Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets and streamlining the organizational structure. Hospira expects to incur aggregate charges related to these actions in the range of $140 million to $160 million on a pre-tax basis, of which approximately $100 million to $110 million are expected to be reported as restructuring costs and other asset charges. During 2009, Hospira incurred aggregate charges of $83.7 million with $50.6 million recorded as restructuring and other asset charges.

\* \* \*

Net sales in the Americas segment increased 10.3%, or 11.1% excluding the impact of changes in foreign exchange rates . . . . ***Net sales in Medication Management Systems were slightly higher with increased volumes in ambulatory and large volume infusion systems, primarily Plum A+<sup>TM</sup>, and dedicated administration sets***.

42.     On April 13, 2010, the SEC uploaded to EDGAR a letter it sent to Hospira that same day concerning the Company's 2009 Form 10-K, which instructed the Company to expand and "revise to clarify" its disclosures concerning the August 12, 2009 Warning Letter "to state the failures experienced by the AC power cords and to describe the contents of the FDA letter." Continuing, the SEC letter stated, in relevant part:

> Furthermore, you note on page 48 that you have recognized costs relating to the recall of the power cords "and certain other products." Please revise to clarify exactly what costs you have recognized, what other products experienced recall in the last fiscal year and the remediation efforts you have undertaken. You should also expand your disclosure to state not only that these matters have not materially impacted your ability to market and sell your products but also, if true, that they have not materially impacted either your Company as a whole or your financial results. If you believe there has been no material impact, please provide a basis for that opinion.

43.     Then, on April 13, 2010, Hospira announced that the Company received an additional Warning Letter, dated April 12, 2010, from the FDA "in connection with the FDA's inspection of the Company's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina." A true and correct copy of the April 12, 2010 Warning Letter is attached hereto as *Exhibit B*. The April 12, 2010 Warning Letter, which the Company did not attach to its press release, indicated that the Company's November 6, 2009 voluntary recall of propofol and liposyn products involved lots "*manufactured in 2007*" that contained "*visible particle contamination*" and that Hospira failed to detect the problem until November 2009. The Company's press release, which omitted this critical information, stated, in part:

> In the warning letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture the Company's products at the Rocky Mount facility. The letter also asserts other inadequacies, including the Company's procedures related to the Quality Control unit, investigations, and medical device reporting obligations. The letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in an August 12, 2009 warning letter to the Company's Morgan Hill, California facility.

The Company will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations. *The warning letter does not restrict production or shipment of the Company's products from these facilities, but the Company is holding shipment of certain products pending its further investigation and discussions with the FDA. The Company does not anticipate that these matters will adversely impact the Company's ability to achieve the 2010 financial projections communicated with the full year 2009 earnings release.*

44.     The market did not respond negatively to Defendants' statements regarding the warning letter. On April 18, 2010, analysts from Morgan Stanley described the impact of the letter as "manageable," and stated, "Expected timelines to resolution may be relatively brief (weeks) for the two voluntarily suspended products as one of the products, propofol, is already on the FDA's drug shortage list, the company is awaiting FDA approval of manufacturing changes (additional filtration steps) to prevent the problem, and a facility re-inspection is unlikely to be required."

45.     On April 23, 2010, through a filing with the SEC, Hospira indicated to the SEC that it would respond to the SEC's April 13, 2010 letter on or before May 11, 2010.

46.     On April 27, 2010, Hospira issued a press release reporting the Company's first quarter 2010 financial results for the three months ended March 31, 2010. The press release discussed the Company's first quarter financial results and 2010 projections, stating in pertinent part:

Net sales for the quarter were $1.0 billion, and adjusted* diluted earnings per share were $0.94. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"*Hospira started out the year with very strong sales and profitability. Our positive performance was driven by continued momentum in our Specialty Injectable Pharmaceuticals business, as well as by additional progress on our Project Fuel optimization initiatives*," said Christopher B. Begley, chairman and chief executive officer. "*Based on our first-quarter performance and the expected benefit to sales from acquiring Orchid Chemicals & Pharmaceuticals' generic injectable business, we have increased our full-year guidance. We remain dedicated to delivering on our commitments to our customers and patients through focused execution and improving shareholder value through sustainable top- and bottom-line growth.*"

\*     \*     \*

*Adjusted\* income from operations increased 60.0 percent to $240 million in the first quarter of 2010, compared to $150 million in the first quarter of 2009. Driving the majority of the increase were* higher net sales, more favorable product mix and *improved manufacturing efficiency from the company's Project Fuel optimization initiatives.*

\*       \*       \*

**2010 Projections**

*Hospira now expects net sales to increase approximately 3 to 5 percent on a constant-currency basis.* Including the impact of foreign exchange, the company expects net sales growth to be 4 to 6 percent.

*Hospira is also increasing its adjusted\* diluted earnings per share projection for full-year 2010, which now is expected to range between $3.35 and $3.45 per share.*

47.     Also on April 27, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2010. The Company's Form 10-Q reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Begley. The Form 10-Q stated, in part:

*In March 2009, Hospira announced details of a restructuring and optimization plan, ("Project Fuel"), which will occur over the next two years from the date of the announcement.* Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets, and streamlining the organizational structure. Hospira expects to incur aggregate restructuring costs and other asset charges related to these actions in the range of $100 million to $110 million on a pre-tax basis. During the three months ended March 31, 2010 and 2009, Hospira incurred, primarily in the Americas segment, pre-tax Restructuring charges of $2.8 million and $4.7 million, respectively.

\*       \*       \*

Net sales in the Americas segment increased 19.1%, or 17.4% excluding the impact of changes in foreign exchange rates . . . . Net sales in Medication Management Systems were higher due to the TheraDoc acquisition which occurred in October 2009 and *increased volumes primarily due to dedicated administration sets and higher Plum A+$^{TM}$ infusion pumps, offset by lower sales of Symbiq$^{TM}$ infusion pumps.*

48.     The Form 10-Q further discussed "Certain Quality and Product Related Matters," and revealed that Hospira had placed a "*voluntary hold*" on its line of Symbiq infusion pumps. It also

revealed, without providing specifics, that Hospira was now "***withholding shipment of certain***

***products***" from its offending facilities.  The Form 10-Q stated, in part:

> In August 2009, Hospira received a Warning Letter from the U.S. Food and Drug
> Administration ("FDA") related to Hospira's corrective action plans with respect to
> the failure of certain AC power cords manufactured by a third party.  The affected
> power cords are used on certain infusion pumps and related products.  Hospira
> initiated a voluntary recall of the affected power cords in August 2009.  The recall
> was limited to device power cords with a certain prong design that could crack and
> fail at/or inside the plug.  Although Hospira had not received any reports of serious
> patient harm, Hospira had received customer reports of sparking or charring on the
> plug of these power cords. ***The FDA's Warning Letter cited deficiencies regarding***
> ***Hospira's corrective action plans, and that Hospira failed to identify the actions***
> ***needed to correct and prevent the recurrence of nonconforming product and other***
> ***quality problems. Hospira has responded to the Warning Letter and is working***
> ***closely with the FDA to conclude this matter. Hospira has initiated and completed***
> ***a substantial portion of the field corrections and other remediation activities with***
> ***respect to the recalled products for which the related costs had been reserved for***
> ***during 2009***.  It is possible that additional costs related to this recall may be required
> in future periods, based on modifications to the current remediation plans and
> changes in estimates as a result of ongoing dialogue with the FDA.
>
> ***In April 2010, Hospira placed a voluntary hold on all shipments***
> ***of Symbiq^{TM} pumps, a large volume infusion device, to new customers.  Hospira***
> ***initiated this hold after it received an unexplained increase in customer complaints***
> ***related to the failure of the Symbiq^{TM} pump to alarm at the end of infusion therapy***
> ***under certain use conditions.  Hospira cannot predict when it will lift this***
> ***voluntary hold and is developing a comprehensive action plan to address this issue***.
>
> In April 2010, Hospira received a Warning Letter from the FDA in connection with
> the FDA's inspection of Hospira's pharmaceutical and device manufacturing
> facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. ***In***
> ***the letter, the FDA cites Current Good Manufacturing Practice deficiencies related***
> ***to particulate in certain emulsion products at the Clayton facility and the failure to***
> ***adequately validate the processes used to manufacture products at the Rocky***
> ***Mount facility.  The letter also asserts other inadequacies, including procedures***
> ***related to the Quality Control unit, investigations, and medical reporting***
> ***obligations. The letter asserts that some of the deficiencies were repeat***
> ***observations from a prior inspection conducted in April 2009, and include a***
> ***similar violation cited in the August 2009 Warning Letter. Hospira will be***
> ***undertaking a comprehensive review of its manufacturing operations to ensure***
> ***compliance with applicable regulations. The letter does not restrict production or***
> ***shipment of Hospira's products from these facilities but Hospira is holding***
> ***shipment of certain products pending its further investigation and discussions with***
> ***the FDA***. Hospira cannot predict when it will resume shipment of these products.
> Hospira takes this matter seriously and intends to respond fully, and in a timely
> manner, to the FDA's Warning Letter.

*Hospira has recognized charges in Costs of goods sold for quality assessment and testing, materials, labor and freight to remediate the matters described above, which have not been significant to date to Hospira. These matters have impacted Hospira's ability to market and sell certain products as noted above, which the impact has not been significant to date to Hospira.*

49. On May 11, 2010, the Company responded to the SEC's April 12, 2010 Warning Letter. In its response, the Company admitted that it would, in the future, describe "the failures experienced by the AC power cords" and would "provide more detail as to the contents of the warning letter." The Company's May 11, 2010 letter provided additional detail stating that Hospira was withholding shipments of liposyn, propofol, and Hospira's Symbiq infusion pump. The letter stated, in relevant part:

Your comment further requests additional disclosure related to the recall costs that were recognized, the specific products subject to recall and the related remediation efforts. The costs incurred in 2009 in connection with the AC power cord recall were not significant to the Company, and were approximately $6 million pre-tax, which included costs primarily related to quality assessment and testing, materials, labor, and freight. The remediation activities related to the AC power cords are substantially complete, and the related costs were fully reserved for in 2009. This was disclosed in the Company's 2010 First Quarter Form 10-Q.

*The other voluntary product recalls in 2009 were limited in scope and not related to the AC power cord warning letter. The Company considered these additional recalls to be part of the ordinary course of its business, namely the manufacture and sale of highly regulated pharmaceutical and device products.*

*       *       *

Even though the Company considered these actions to be part of the ordinary course of the Company's business, it determined to include an additional section in the MD&A of its Form 10-Q for the three and nine months ending September 30, 2009 as well as its Form 10-K captioned "Certain Regulatory Matters," primarily as a result of the Company's receipt of the FDA warning letter and the increased inspection activities of the FDA. The Company takes the receipt of an FDA warning letter seriously, and determined it appropriate to acknowledge receipt of the warning letter and to inform investors that further adverse action by the FDA could lead to additional costs or penalties that could be material to the Company. The Company's disclosure also referenced certain other product remediation activities and costs. The Company wanted to inform investors that the power cord recall was not the only remediation activity that the Company took with respect to its products during the reporting period. *The Company's disclosure was also intended to inform investors that the other remediation activities, which were primarily related to the*

*Company's Liposyn^{TM}, Propofol, and Symbiq^{TM} products, were ongoing*, could result in further adverse regulatory developments in the future, and could lead to increased costs or penalties. *The Company determined that the costs related to the other products were not significant to the Company as a whole or its financial results, were part of the ordinary course of business, and were less than 2% of our cost of goods sold.* Nevertheless, in the MD&A section of its Form 10-K, the Company referred to the costs associated with certain product corrective actions when it discussed the year-over-year change in gross profit.

In future filings, *the Company confirms that it will specifically state that the regulatory matters have not materially impacted the Company's ability to market and sell its products and have not materially impacted the Company or its financial results, if those statements are true* and the costs have not been significant to the Company. If the change in costs become significant to the Company or its financial results, or the regulatory matters begin to significantly impact the Company's ability to market and sell its products, then the Company confirms that it will provide appropriate detail in its future filings related to the recognized costs and related remediation efforts.

50.     On May 14, 2010, Hospira issued a press release announcing that Mr. Ronald A. Matricaria had resigned "for personal reasons" from Hospira's board of directors effective at the end of the second quarter, June 30, 2010.

51.     On July 16, 2010, the SEC responded to Hospira's May 11, 2010 correspondence. The SEC instructed the Company to confirm that its disclosures regarding the August 12, 2009 Warning Letter would "describe the deficiencies cited by the FDA regarding your corrective action plans and [would] specify the remediation activities that you have undertaken."

52.     On July 28, 2010, Hospira issued a press release reporting the Company's second quarter 2010 financial results for the three months ended June 30, 2010. The press release discussed the Company's second quarter financial results and 2010 projections, stating in pertinent part:

Net sales for the quarter were $968 million, and adjusted* diluted earnings per share were $0.86. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"*Hospira delivered another solid quarter, driven by strong performance in our Specialty Injectable Pharmaceuticals business and by continued momentum of our Project Fuel optimization initiatives*," said Christopher B. Begley, chairman and chief executive officer. "*We made significant progress in advancing our business during the quarter,* launching our first product from Hospira India, commercializing

our second biosimilar product in Europe and strengthening our position in acute-care proprietary pharmaceuticals. *We are highly focused on executing our strategy of investing for growth and improving margins and cash flow, as well as on driving quality improvements across our global manufacturing organization. We remain on track to achieve our full-year earnings projections.*"

\*　　\*　　\*

Net sales increased 1.2 percent to $968 million in the second quarter of 2010, compared to $957 million in the second quarter of 2009. *Strong sales* in Specialty Injectable Pharmaceuticals, resulting from the U.S. sales of the generic oncolytic oxaliplatin and Precedex™, Hospira's proprietary sedation agent, *were primarily offset by a decline in Medication Management Systems as a result of the company's voluntary hold on shipments of its Symbiq™ Infusion System to new customers*.

Adjusted\* income from operations increased 20.6 percent to $213 million in the second quarter of 2010, compared to $177 million in the second quarter of 2009. *Driving the majority of the increase were more favorable product mix and improved manufacturing efficiency from the company's Project Fuel optimization initiatives, offset by charges associated with certain quality and product-related matters*.

\*　　\*　　\*

**2010 Projections**

*Hospira is maintaining guidance for net sales growth of approximately 3 to 5 percent* on a constant-currency basis. Including the impact of foreign exchange, the company currently expects net sales growth to also be 3 to 5 percent.

*Hospira is maintaining its adjusted\* diluted earnings per share projection for full-year 2010, which is expected to range between $3.35 and $3.45 per share.*

53.     Also on July 28, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2010. The Company's Form 10-Q reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Begley. The Form 10-Q stated, in part:

*In March 2009, Hospira announced details of a restructuring and optimization plan ("Project Fuel"), which will occur over the next two years from the date of the announcement*. Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets, and streamlining the organizational structure. Hospira now expects to incur aggregate restructuring costs and other asset charges related to these actions in the range of $60 million to $70 million on a pre-tax basis, a reduction from the originally announced range of $100 million to $110

million, primarily related to reduced inventory write-offs and an expected decrease in employee-related benefit costs. These decreases are off-set by an increase in process optimization costs, non-restructuring and other asset charges, resulting in no change to the projected aggregate charges related to Project Fuel.

\* \* \*

Net sales in the Americas segment increased 3.9%, or 2.8% excluding the impact of changes in foreign exchange rates . . . . *Net sales in Medication Management Systems were lower driven by decreased volumes related to the voluntary hold on shipments of Symbiq*$^{TM}$ *pumps and decreased Plum*$^{TM}$ *pumps volumes related to temporary supply constraints.*

\* \* \*

Gross profit increased $23.0 million, or 6.6%, for the three months ended June 30, 2010, compared with the same period in 2009.

The gross profit increase was primarily the result of higher sales volume and favorable product mix including the impact of the U.S. oxaliplatin sales and continued higher sales of Precedex$^{TM}$. *In addition, cost reductions associated with Project Fuel initiatives and the impact of foreign exchange contributed to the increase, partly offset by activities directly associated with the FDA's Warning Letter received in April 2010 and voluntary shipment holds on certain products, as previously described, as well as penalties for failure to supply customers and increased warranty charges on these and other products.*

54. The Form 10-Q further discussed "Certain Quality and Product Related Matters," and stated in part:

In *April 2010, Hospira placed a voluntary hold on all shipments of Symbiq*$^{TM}$ *pumps, a large volume infusion device, to new customers. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq*$^{TM}$ *pump to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq*$^{TM}$ *pump to alarm at the end of infusion therapy.* Hospira has not asked customers to return or cease using their Symbiq$^{TM}$ pumps. *The FDA has classified this voluntary action as a Class I recall and Hospira is working with the FDA to finalize a comprehensive action plan to address this issue.* Hospira cannot predict when it will lift this voluntary hold. Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate this matter, which have not been significant to date to Hospira.

In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing

facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. In the Warning Letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in the August 2009 Warning Letter related to the AC power cords. *The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities. Hospira has begun to undertake a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.*

Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. *As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility. Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira is working to resume shipment of these products, but cannot predict when such shipments will commence.*

*During the three months ended June 30, 2010, Hospira recognized pre-tax charges, in Cost of products sold, of $25.8 million for third party oversight and consulting, and penalties for failure to supply product to certain customers under various contracts, all directly associated with Hospira's response to the FDA's Warning Letter received in April 2010. These costs include activities associated with the matters cited above for the Rocky Mount and Clayton facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities. Hospira expects to incur an additional $10 million to $15 million per remaining quarter in 2010 related to these activities.*

*These quality matters have impacted, and may impact further, Hospira's ability to market and sell certain products including Symbiq$^{TM}$ pumps and certain emulsion products primarily in the Americas segment. Additionally, these quality matters have resulted in, and may further result in, higher customer backlog orders and penalties for failure to supply products, which historically have not been material.*

55. Responding to the Company's disclosures, on July 28, 2010, analysts from The Buckingham Research Group, rating Hospira stock a buy, stated that "Hospira believes that the FDA has accepted its plan to remediate two key pharmaceutical plants although there is a short-term hit with back-orders and remediation expenses." Likewise, on the same day analysts from JP Morgan stated that:

> While Hospira's 2Q results has some noise, these are primarily short-term issues and do not dampen our enthusiasm for the longer-term story. The company is addressing its manufacturing issues, should return Symbiq to market in 2011, and should be able to pick up incremental MMS sales from the Baxter recall in 2011. Looking beyond the quarter and near-term challenges the company is addressing, we continue to see inherent leverage in the Hospira model with several major opportunities ahead for the company . . . . We are maintaining our Overweight rating.

Although Capstone Investments' analysts labeled the Company's "Q2 Revenues Slightly Disappointing," they maintained their buy rating on the stock.

56. On August 20, 2010, Hospira issued a press release announcing that Begley intended to retire as CEO upon appointment of a successor, but would remain executive chairman of the Board. Hospira also announced that Chief Operating officer ("COO") Kearney intended to retire by the end of 2010.

57. On October 26, 2010, Hospira issued a press release reporting the Company's third quarter 2010 financial results for the three months ended September 30, 2010. The press release discussed the Company's third quarter financial results and 2010 projections, stating in pertinent part:

> Net sales for the quarter were $949 million, and adjusted* diluted earnings per share were $0.74. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)
>
> "*Hospira delivered a solid third quarter, despite difficult year-over-year comparisons from the temporary discontinuation of U.S. oxaliplatin sales and the impact of several divestitures,*" said Christopher B. Begley, chairman and chief executive officer. "*During the quarter, we gained momentum on several of our existing and newly launched specialty pharmaceuticals; we saw continued contributions from Project Fuel, our companywide optimization initiative; and we*

*made good progress on our quality-improvement efforts. We believe the efforts and advancements we are making this year position Hospira for another good year and continued growth going forward.*"

\*       \*       \*

*Net sales decreased 5.8 percent to $949 million in the third quarter of 2010, compared to $1.0 billion in the third quarter of 2009.* Strong sales in Specialty Injectable Pharmaceuticals, resulting from the U.S. sales of Precedex™, meropenem, vancomycin and heparin, *were more than offset* by the temporary discontinuation of U.S. sales of oxaliplatin pursuant to a litigation settlement and the *decline in Medication Management Systems, primarily a result of the company's voluntary hold on shipments of its Symbiq™ Infusion System to new customers.*

Adjusted\* income from operations decreased 8.6 percent to $189 million in the third quarter of 2010, compared to $207 million in the third quarter of 2009. *Improved manufacturing efficiency from the company's Project Fuel optimization initiatives was more than offset by lower sales volume and associated margins primarily due to* the temporary exit from the U.S. oxaliplatin market, *charges associated with certain quality and product-related matters*, and higher research and development expenses related to new product development programs, including clinical trials.

\*       \*       \*

**2010 Projections**

*Due to delays in customer purchasing decisions in Medication Management Systems* as well as the expectation of lower-than-anticipated sales growth in Other Pharma, *the company now projects net sales growth of approximately 2 to 3 percent on a constant-currency basis. On a reported basis, the company expects net sales growth of 3 to 4 percent.*

*Hospira has narrowed its adjusted\* diluted earnings per share projection to the upper range of the previous projection. The company now expects adjusted\* diluted earnings per share for full-year 2010 to be between $3.40 and $3.45.*

58.     Also on October 26, 2010, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2010. The Company's Form 10-Q reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Begley. The Form 10-Q stated, in part:

*In March 2009, Hospira announced details of a restructuring and optimization plan ("Project Fuel"), which will occur over the next two years from the date of the announcement.* Project Fuel includes the following activities: optimizing the product portfolio, evaluating non-strategic assets, and streamlining the organizational structure. Hospira now expects to incur aggregate restructuring costs and other asset

charges related to these actions in the range of $60 million to $70 million on a pre-tax basis, a reduction from the originally announced range of $100 million to $110 million, primarily related to reduced inventory write-offs and a decrease in employee-related benefit costs. These decreases are off-set by an increase in process optimization costs, non-restructuring and other asset charges, resulting in no change to the projected aggregate charges related to Project Fuel.

* * *

Net sales in the Americas segment decreased (5.1)%, or (5.6)% excluding the impact of changes in foreign exchange rates. Net sales of Specialty Injectable Pharmaceuticals decreased primarily due to Hospira's temporary exit from the U.S. market for oxaliplatin products on June 30, 2010 pursuant to the litigation settlement, see Note 17 to the condensed consolidated financial statements included in Part I Item 1, and a voluntary hold on shipment of certain other products. The decrease was partially offset by the U.S. launch of the generic anti-infective product, meropenem, and increased volume for Hospira's proprietary sedation drug, Precedex$^{TM}$. Other Pharma net sales decreased primarily due to lower volumes in nutritional products. ***Medication Management Systems net sales were lower driven by decreased volumes related to the voluntary hold on shipments of Symbiq$^{TM}$ and decreased sales of Plum$^{TM}$***, partly offset by increased sales of dedicated administration sets.

* * *

Gross profit decreased $(28.6) million, or (7.2)%, for the three months ended September 30, 2010, compared with the same period in 2009.

***The gross profit decrease was primarily the result of*** lower sales volume including the impact of the temporary exit from the U.S. oxaliplatin market ***and activities directly associated with the FDA's April 2010 Warning Letter***, partially offset by increased sales of Precedex$^{TM}$ and other new product introductions, ***and cost reductions associated with Project Fuel initiatives***.

59.    The Form 10-Q further discussed "Certain Quality and Product Related Matters," and stated in part:

In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. In the Warning Letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar

violation cited in the August 2009 Warning Letter related to the AC power cords. The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities. *Hospira has made significant progress on completing a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations*.

Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility. *Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira resumed shipment of certain products placed on voluntary shipping hold, but cannot predict when all products on voluntary hold will be reintroduced to the market*.

*During the three and nine months ended September 30, 2010, Hospira recognized pre-tax charges, in Cost of products sold, of $15.1 million and $40.9 million for third party oversight and consulting, idle facility costs and penalties for failure to supply product to certain customers under various contracts, all directly associated with Hospira's response to the FDA's Warning Letter received in April 2010. These costs include activities associated with the matters cited above for the Rocky Mount and Clayton facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities. Hospira expects to incur an additional $10 million to $15 million in the fourth quarter of 2010 related to these activities*.

Symbiq™ Pumps

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq™, a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq™ to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq™ to alarm at the end of infusion therapy. *In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq™ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened*. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the

infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Further, Hospira is developing a solution to improve the performance of the pump and the issues therewith. *Hospira has not asked customers to return or cease using their Symbiq$^{TM}$ pumps. Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira.* Further, costs for long-term solutions and product improvements will depend on various product development efforts and corresponding regulatory outcomes in connection therewith.

\*      \*      \*

*These quality matters have impacted, and may impact further, Hospira's ability to market and sell certain products including Symbiq$^{TM}$ pumps and certain emulsion products primarily in the Americas segment. Additionally, these quality matters have resulted in, and may further result in, higher customer backlog orders and penalties for failure to supply products, which historically have not been material.*

60.     In response to Defendants' statements, on October 26, 2010, analysts from JP Morgan responded positively, stating that the Company was "[p]ositioned for [s]ignificant 2011 [g]rowth." JP Morgan analysts pointed to Hospira's "good progress on the measures it is taking to improve manufacturing quality at its facilities in Clayton and Rocky Mount, North Carolina which were the subject of an FDA warning letter earlier this year" and that the Company "remains on track to complete most of the improvements by year-end." On October 27, 2010, Morgan Stanley analysts stated that Hospira "delivered a solid quarter" that the Project Fuel was producing clear benefits. On October 27, 2011, The Buckingham Research Group stated that Hospira's 2011 outlook "should benefit from some ongoing Project Fuel (optimization program) results with incremental year-year synergies."

61.     On January 4, 2011, the Company issued a press release announcing that Terrence C. Kearney, COO of Hospira, retired from the Company.

62.     On February 2, 2011, Hospira issued a press release reporting the Company's fourth quarter and full-year 2010 financial results for the three and twelve months ended December 31,

2010. The press release discussed the Company's fourth quarter and full-year financial results, as well as its 2011 projections, stating in pertinent part:

> For the fourth quarter of 2010, net sales were $992 million, and adjusted* diluted earnings per share were $0.77. For full-year 2010, net sales were $3.9 billion, and adjusted* diluted earnings per share were $3.31. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)
>
> "*2010 marked a year of progress for Hospira, despite several unanticipated challenges*," said Christopher B. Begley, chairman and chief executive officer. "We launched gemcitabine, a large oncology drug, in the United States during the fourth quarter, the first generic version of the drug in the market; we expanded both our operations and portfolio geographically; *we made substantial progress with our quality initiatives; and we met our commitments with Project Fuel, our corporate-wide optimization initiative. Looking forward, we expect a year of good growth in 2011, as we remain committed to transforming challenges into opportunities and driving continuous improvement across the organization.*"
>
>         \*      \*      \*
>
> Net sales decreased 6.0 percent to $992 million in the fourth quarter of 2010, compared to $1.1 billion in the fourth quarter of 2009. Sales in Specialty Injectable Pharmaceuticals were solid, despite the year-over-year impact of the temporary discontinuation of U.S. sales of the oncolytic oxaliplatin pursuant to a litigation settlement. *The solid Specialty Injectable Pharmaceutical sales were more than offset, however, by the decline in Medication Management, which was primarily a result of the company's voluntary hold on shipments of its Symbiq™ Infusion System to new customers*; and the decline in Other Pharma, mainly a result of the impact of non-strategic asset divestitures.
>
> Adjusted* income from operations decreased 30.7 percent to $142 million in the fourth quarter of 2010, compared to $204 million in the fourth quarter of 2009. *Improved manufacturing efficiency from the company's Project Fuel optimization initiatives was more than offset by lower net sales; the impact of charges associated with certain quality and product related matters*; and higher research and development expenses related to new product development programs, including clinical trials.
>
>         \*      \*      \*
>
> 2011 Projections
>
> *Hospira expects net sales growth for full-year 2011 to be approximately 5 to 7 percent* on a constant-currency basis. The company expects foreign exchange to provide a positive contribution of approximately 1 percent, based on current

exchange rates. The net sales projections assume U.S. launches during 2011 of two oncolytics, docetaxel and a solution presentation of gemcitabine.

***Adjusted\* diluted earnings per share for 2011 are expected to be in the range of $3.90 to $4.00, or year-over-year growth of 18 to 21 percent.***

\*    \*    \*

"Hospira is on track for a good year in 2011, with our projections for solid sales and earnings growth," said Begley. "We are driving continued improvement throughout the organization with our crisp focus on executing our strategy, and we look forward to progressing toward our longer-term financial goals, creating sustainable growth and driving shareholder value."

63.    On February 2, 2011, analysts from The Buckingham Research Group placed Hospira "Under Review," pointing to "[h]igher levels of back-orders and a much lower gross margin [that] impacted results and Hospira indicated that [it] learned late in the quarter that it would not meet results but chose not to pre-announce an EPS shortfall." On February 3, 2011, analysts from Morgan Stanley stated the "underlying fundamentals of the business remain intact," but also stated "[t]he quarter and guidance were well below expectations and earnings expectations for 2011+ will re-base as a result."

64.    On February 16, 2011, Hospira filed with the SEC its annual report on Form 10-K for the fiscal year ending December 31, 2010. The Company's Form 10-K reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Begley. The Form 10-K discussed "Quality Assurance" and "Certain Quality and Product Related Matters," and stated in part:

Hospira has received notices from regulatory authorities alleging violations of applicable regulations and standards, and Hospira has developed definitive action plans, implemented remedial programs and modified its practices to address these issues.

\*    \*    \*

Warning Letter (April 2010)

In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. In the Warning Letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in the August 2009 Warning Letter related to the AC power cords. The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities. Hospira has made significant progress on completing a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.

Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. *As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility. Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira resumed shipment of certain products placed on voluntary shipping hold, but cannot predict when all products on voluntary hold will be reintroduced to the market.*

*During 2010, Hospira recognized pre-tax charges, in Cost of products sold, of $54.3 million for third party oversight and consulting, idle facility costs and penalties for failure to supply product to certain customers under various contracts, all directly associated with Hospira's response to the FDA's Warning Letter received in April 2010. These costs include activities associated with the matters cited above for the Rocky Mount and Clayton facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities.*

*Symbiq*[TM] *Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq[TM], a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the

Symbiq™ to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq™ to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq™ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. ***Hospira has not asked customers to return or cease using their Symbiq™ pumps. Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira***.

Additionally, Hospira is working to address the failure to alarm issue with a software upgrade package. The software upgrade package submission will be one of the first to follow the guidelines of the new 510K process of the FDA, thus approval timing remains uncertain. New pump placements for Symbiq™ will remain on voluntary hold until we receive FDA approval of our 510K submission. Further, costs for long-term solutions and product improvements will depend on various product development efforts and corresponding regulatory outcomes in connection therewith.

*Plum™ Pumps*

In December 2010, Hospira informed the FDA that we had received a small number of customer reports associated with the Plum™ pumps regarding failure of the pump's audible alarm under certain conditions. Hospira has provided notice to customers notifying them of the corrective action plan. For the Plum A+™ pumps, the alarm failures are associated with the alarm assembly which will need to be replaced. For the Plum XL™ pumps, the alarm failure is associated with fluid ingress and physical damage to the alarm assembly over time. Plum XL™ customers are being asked to follow the proper cleaning procedure and inspect the alarm assembly for physical damage during routine maintenance. This action is classified as a field recall and FDA is not requiring Hospira to remove Plum™ pumps from the market or halt production. Hospira will service the pumps in the field, for which Hospira recognized a charge of $25.0 million for the estimate of the field recall as of December 31, 2010.

65.     Discussing the Company's financial performance, the Form 10-K stated, in relevant

part:

Net sales in the Americas segment increased 2.4%, or 1.5% excluding the impact of changes in foreign exchange rates. Net sales of Specialty Injectable Pharmaceuticals ("SIP") increased primarily due to increased volume for Precedex™, the launch of generic meropenem and gemcitabine and high-dose heparin introduced in late 2009.

*The increase was partially offset by a decrease in volume due to a voluntary hold on shipments of certain emulsion products.* Other Pharma net sales decreased primarily due to the dispositions noted above and lower volumes in nutritional products. *Net sales in Medication Management were lower driven by decreased volumes related to the voluntary hold on shipments of Symbiq*$^{TM}$ *to new customers, decreased sales of Plum*$^{TM}$ and the disposal of the critical care business, partly offset by increased sales of dedicated administration sets.

\*       \*       \*

Gross profit increased $58.0 million, or 4.0%, in 2010, compared to 2009.

The gross profit increase was the result of higher sales volume primarily driven by growth in Precedex$^{TM}$ and new product launches. *In addition, cost reductions associated with Project Fuel initiatives* and the impact of changes in foreign exchange rates contributed to the increase. *These were partly offset by activities and related charges directly associated with the 2010 Warning Letter received from the FDA and voluntary shipment holds on certain products as well as penalties for failure to supply customers* and increased product correction charges on these and other products.

66.     On March 7, 2011, Hospira announced the election of defendant F. Michael Ball as the Company's CEO, effective March 28, 2011, replacing Mr. Begley.

67.     On March 24, 2011, Hospira issued a press release updating its financial projections and *raising its outlook* as a result of strong demand for its recently-FDA-approved drug, docetaxel. The release also *confirmed the Company's full year 2011 guidance*.

68.     On April 26, 2011, Hospira issued a press release reporting the Company's first quarter 2010 financial results for the three months ended March 31, 2011. The press release discussed the Company's first quarter financial results and 2011 projections, stating in pertinent part:

Net sales for the quarter were $1.0 billion, and adjusted\* diluted earnings per share were $0.93. (Adjusted\* measures exclude certain specified items as described later in this press release and the attached schedules.)

"*Hospira started out the year with a stronger-than-expected first quarter*, aided by strong U.S. sales of docetaxel and gemcitabine, two major oncolytic pharmaceuticals," said Christopher B. Begley, executive chairman and former chief executive officer (CEO). "*During the quarter, we gained momentum on several of our existing and newly launched specialty pharmaceuticals and made good progress in decreasing our level of backorders to better serve our customers. We remain focused on driving quality enhancements throughout the organization and*

*on improving shareholder value through strong execution and sustainable growth.*"

\* \* \*

Net sales were $1.0 billion in the first quarter of 2011, relatively flat with the first quarter of 2010.

\* \* \*

Adjusted* income from operations decreased 15 percent to $203 million in the first quarter of 2011, compared to $240 million in the first quarter of 2010. The decline was a result of a difficult year-over-year comparison driven by strong margin contribution from U.S. net sales of oxaliplatin in the first quarter of 2010. *Improved manufacturing efficiency from the company's Project Fuel optimization initiatives* and margin contribution from U.S. sales of docetaxel in the first quarter of 2011 were tempered by the joint-venture arrangement related to the production of docetaxel, as well as by higher research and development expenses associated with new product development programs.

\* \* \*

**2011 Projections**

*Hospira is maintaining guidance for net sales growth of approximately 5 to 7 percent on a constant-currency basis, with foreign exchange expected to contribute a positive 1 percent.*

*Adjusted* diluted earnings per share projections for full-year 2011 remain between $3.90 and $4.00 per share, or year-over-year growth of 18 to 21 percent.*

69.     Also on April 26, 2011, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2011. The Company's Form 10-Q reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Ball. The Form 10-Q further discussed the Company's "Certain Quality and Product Related Matters," and stated in part:

In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Clayton, North Carolina and Rocky Mount, North Carolina. In the Warning Letter, the FDA cited Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting

obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009. The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities.

Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling certain products manufactured at the Clayton and Rocky Mount facility. Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. Hospira has made significant progress on completing a comprehensive review of all its manufacturing operations to ensure compliance with applicable regulations. *The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira resumed shipment of certain products placed on voluntary shipping hold*, but cannot predict when all products on voluntary hold will be reintroduced to the market.

In January 2011, the FDA conducted a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the April 2010 Warning Letter. The FDA did not issue an Inspectional Observation (Form FDA 483) of any potentially objectionable conditions related to the Clayton inspection. *The FDA has tentatively scheduled the follow-up inspection at the Rocky Mount facility to occur during the second quarter of 2011.*

During 2010, Hospira incurred changes of $54.3 million related to the activities associated with the matters cited above for the Clayton and Rocky Mount facility as well as Hospira's assessment of status of its quality operations on a holistic basis throughout its global manufacturing facilities. *During 2011, Hospira continued to invest in quality operations throughout its global manufacturing facilities, however to remediate the specific matters cited above, the charges incurred were not significant during the three months ended March 31, 2011.*

*Symbiq*[TM] *Infusion Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq[TM], a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq[TM] to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq[TM] to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of

unrestricted flow when the Symbiq™ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their Symbiq™ pumps. ***Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira***.

Hospira has submitted the appropriate applications for modifications to its Symbiq™ infusion system to regulatory agencies in various countries. On March 31, 2011, Hospira submitted a 510(k) application with the FDA for these modifications. The 510(k) application included software updates to further enhance the reliability of the infusion system, and to correct the recall issues impacting the device. Hospira believes this application is one of the first in the industry to be submitted under recent FDA draft guidance for 510(k) infusion pump clearances, which makes it difficult to project the timeline for FDA clearance of this Symbiq™ update and Hospira is not able to predict the timeline for approval by the other regulatory agencies. New customer pump placements for Symbiq™ will remain on voluntary hold until Hospira receives the clearance from the applicable regulatory agencies. Further, costs for long-term solutions and product improvements will depend on various product development efforts and corresponding regulatory outcomes in connection therewith.

*Plum™ Infusion Pumps*

In December 2010, Hospira informed the FDA that it had received a small number of customer reports associated with the Plum A+™ and XL family of infusion pumps regarding failure of the pump's audible alarm under certain conditions. Hospira has notified customers of the corrective action plan to address this issue. For the Plum A+™ pumps, the alarm failures are associated with the alarm assembly which will need to be replaced. For the Plum XL™ pumps, the alarm failure is associated with fluid ingress and physical damage to the alarm assembly over time. Plum XL™ customers are being asked to follow the proper cleaning procedure and inspect the alarm assembly for physical damage during routine maintenance. ***The Plum A+™ action has been classified as a Class II field recall and FDA is not requiring Hospira to remove any Plum™ pumps from the market or halt production. Hospira recognized a charge of $26 million for the estimated costs of the field recall during December 2010 and expects the remediation to extend through the remainder of 2011 and into the first half of 2012***.

70.    Discussing the Company's financial performance, the Form 10-Q stated, in relevant

part:

Net sales in the Americas segment decreased 0.8%, or 1.4% excluding the impact of changes in foreign exchange rates . . . . ***Net sales in Medication Management were lower due to decreased sales volumes for Symbiq$^{TM}$ resulting from shipment hold and Plum$^{TM}$ infusion pumps***; partly offset by higher sales of dedicated administration sets. Net sales in Other Pharma decreased due to lower volumes for solution products and contract manufacturing service due to the timing of customer orders.

71.     Reacting positively to the Company's seemingly strong results and announced $1 billion stock repurchase program, analysts from JP Morgan stated "What a Difference a Qtr Makes; Solid Results Across Pharma and Medication Mgmt."  JP Morgan stated, "[w]e are raising our year end 2011 price target for Hospira to $66."

72.     On July 27, 2011, Hospira issued a press release reporting the Company's second quarter 2011 financial results for the three months ended June 30, 2011.  The press release discussed the Company's second quarter financial results and 2011 projections, stating in pertinent part:

Net sales for the quarter were $1.1 billion, and adjusted* diluted earnings per share were $0.94. (Adjusted* measures exclude certain specified items as described later in this press release and the attached schedules.)

"***Hospira delivered strong second-quarter performance***, driven primarily by positive results for the oncolytic docetaxel in the United States," said F. Michael Ball, chief executive officer.  "***We continued to advance the business and make progress on our quality and product supply improvement initiatives. In part due to the quarter's results, we are increasing our sales projections for the year, and remain focused on driving value for our customers, patients and shareholders.***"

\*     \*     \*

**2011 Projections**

***Hospira is now projecting full-year net sales growth of approximately 7 to 9 percent on a constant-currency basis, with foreign exchange now expected to contribute an additional 2 percent.***

***The company anticipates that the projected higher sales growth will be offset by lower than originally anticipated gross margin performance. As a result, Hospira is maintaining its adjusted\* diluted earnings per share projection for full-year 2011, which is expected to range between $3.90 and $4.00 per share, representing year-over-year growth of 18 to 21 percent.***

73.     Also on July 27, 2011, Hospira filed with the SEC its quarterly report on Form 10-Q

for the period ended June 30, 2011. The Company's Form 10-Q reiterated the Company's financial

results, was signed by Werner, and contained required SOX certifications signed by Werner and

Ball. The Form 10-Q further discussed the Company's "Certain Quality and Product Related

Matters," and stated in part:

> In April 2010, Hospira received a Warning Letter from the FDA (the FDA's
> April 2010 Warning Letter is publicly available on the FDA's website) in connection
> with the FDA's inspection of Hospira's pharmaceutical and device manufacturing
> facilities located in Clayton, North Carolina and Rocky Mount, North Carolina. In
> the Warning Letter, the FDA cited Current Good Manufacturing Practice deficiencies
> related to particulate in certain emulsion products at the Clayton facility and the
> failure to adequately validate the processes used to manufacture products at the
> Rocky Mount facility. The Warning Letter also asserts other inadequacies, including
> procedures related to the Quality Control unit, investigations, and medical reporting
> obligations. The Warning Letter asserts that some of the deficiencies were repeat
> observations from a prior inspection conducted in April 2009. The FDA did not
> believe that Hospira had identified the root cause(s) of the problems and had
> adequately resolved them. The Warning Letter also questioned whether Hospira's
> interim plans ensured the quality of products that were manufactured at the facilities
> while implementing the corrective actions and validation activities.
>
> Hospira has responded to the April 2010 Warning Letter and is working closely with
> the FDA to conclude these matters. As part of Hospira's response, Hospira took
> immediate actions to address the FDA's concerns, including recalling certain
> products manufactured at the Clayton and Rocky Mount facilities. *Hospira has*
> *worked with several third party experts to assist with the activities at both facilities.*
> *Hospira had implemented certain interim controls, including third party oversight,*
> *to ensure products manufactured at both facilities meet their specifications prior to*
> *release. Hospira has completed a comprehensive review of its manufacturing*
> *operations to ensure compliance with applicable regulations, and continues to*
> *ensure compliance with new regulations. The Warning Letter does not restrict*
> *production or shipment of Hospira's products from these facilities but Hospira is*
> *holding shipment of certain products pending its further investigation and*
> *discussions with the FDA. Hospira resumed shipment of certain products placed*
> *on voluntary shipping hold, but cannot predict when all products on voluntary*
> *hold will be reintroduced to the market.*
>
> In January 2011, the FDA conducted a follow-up inspection at the Clayton facility to
> evaluate Hospira's corrective actions in response to items raised in the April 2010
> Warning Letter. The FDA did not issue an Inspectional Observation ("Form 483")
> of any potentially objectionable conditions related to the Clayton inspection. *The*
> *FDA conducted a follow-up inspection at the Rocky Mount facility in May 2011.*
> *The FDA issued a Form 483 for the Rocky Mount inspection listing their*

*observations related to certain quality systems, facilities, and operating procedures. Hospira has submitted a response to the FDA, and continues to interact and work with the FDA to resolve the matters identified in the Form 483.*

*During 2010, Hospira incurred charges of $54.3 million related to the activities associated with the matters cited above for the Clayton and Rocky Mount facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities. During 2011, Hospira continued to invest in quality operations throughout its global manufacturing facilities including at the Clayton and Rocky Mount facilities. However, to remediate the specific matters cited above, charges incurred were not significant during the three and six months ended June 30, 2011.*

*Symbiq*[TM] *Infusion Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq[TM], a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq[TM] to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq[TM] to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq[TM] infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. *Hospira has not asked customers to return or cease using their Symbiq*[TM] *pumps. Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira.*

Hospira has submitted the appropriate applications for modifications to its Symbiq[TM] infusion system to regulatory agencies in various countries. On March 31, 2011, Hospira submitted a 510(k) application with the FDA for these modifications. The 510(k) application included software updates to further enhance the reliability of the infusion system, and to correct the real issues impacting the device. Hospira believes this application is one of the first in the industry to be submitted under recent FDA draft guidance for 510(k) infusion pump clearances, which makes it difficult to project the timeline for FDA clearance of this Symbiq[TM] update and Hospira is not able to predict the timeline for approval by the other regulatory agencies. In May 2011, the FDA responded to the 510(k) application with clarifying questions, which are currently being reviewed by Hospira. *New customer pump placements for Symbiq*[TM] *will remain on voluntary hold until Hospira receives the clearance from the applicable regulatory agencies. Further, costs for long-term*

*solutions and product improvements will depend on various product development efforts and corresponding regulatory outcomes in connection therewith.*

*Plum*<sup>TM</sup> *Infusion Pumps*

In December 2010, Hospira informed the FDA that it had received a small number of customer reports associated with the Plum A+<sup>TM</sup> and XL family of infusion pumps regarding failure of the pump's audible alarm under certain conditions. Hospira has notified customers of the corrective action plan to address this issue. For the Plum A+<sub>TM</sub> pumps, the alarm failures are associated with the alarm assembly. For the Plum XL<sup>TM</sup> pumps, the alarm failure is associated with fluid ingress and physical damage to the alarm assembly over time. Plum XL<sup>TM</sup> customers are being asked to follow the proper cleaning procedure and inspect the alarm assembly for physical damage during routine maintenance. ***The Plum A+*<sup>TM</sup> *and Plum XL*<sup>TM</sup> *actions have been classified as a Class II field recall and the FDA is not requiring Hospira to remove any Plum*<sup>TM</sup> *pumps from the market or halt production. Hospira recognized a charge of $26 million for the estimated costs of the field recall during December 2010. Hospira is in the process of validating replacement components for the Plum A+*<sup>TM</sup> *as part of the overall remediation process and expects the remediation to extend through 2012.*

74.     Discussing the Company's financial results, the Form 10-Q stated, in relevant part:

Net sales in the Americas segment increased 7.9%, or 7.2% excluding the impact of changes in foreign exchange rates . . . . ***Medication Management net sales were lower due to decreased sales volumes for Plum*<sup>TM</sup> *infusion pumps*** and administration sets. Net sales in Other Pharma decreased due to lower volumes for solution products.

75.     On September 7, 2011, Hospira hosted an "investor day," and materials from the investor day meetings were filed with the SEC. In its materials, Hospira touted itself as the medical company "best positioned" to capture additional market share, with the ability to ensure "***high quality, low-cost manufacturing***." The investor presentation also purported to give an "update" on the Company's response to the April 2010 Warning Letter, stating:



> **Warning Letter Update: Rocky Mount**
>
> - Subsequent to the June 2011 inspection, the FDA completed another inspection in August, which resulted in additional Form 483 observations that identified further areas for remediation / improvement
> - We are implementing an aggressive remediation plan, including the assistance of third-party subject matter experts, to quickly address all of the FDA's concerns. We are also evaluating further potential remediation steps
> - Hospira will continue to work closely with the FDA to ensure that all items cited during the inspections and noted in the 483 inspectional observations are appropriately addressed

76.    The investor day presentation also stated that the Company was conducting a "comprehensive, risk-based review" of all of its MMS devices, and that it expected to start field remediation of the Plum pump in 2011 and continue through 2012. ***The Company further disclosed that its remediation would take two to three years at a cost of $200 to $250 million.*** During the presentation, Jim Hardy, Hospira's Senior Vice President of Operations, stated, in part:

> Fixing the foundation is mission critical. Well, if there's two areas of fixing the foundation that are mission critical times two, it's the next two remediation areas that I'm going to talk to you about. The first is our Rocky Mount facility. And let me talk to you a little bit about Rocky Mount. Rocky Mount is a gem of a plant. It has been the crown jewel of Hospira and [the] hospital product division for many years.
>
> \*       \*       \*
>
> So what we don't – what we have in Rocky Mount isn't a problem with how to do this business. But I believe ***we got a little lazy***. I believe that the bar was changing, the puck was moving, you pick the analogy, ***but we were kind of skating behind the puck and it was time for us to get caught up and it was time for us to take on a new mentality and a different approach.***
>
> Well, what happed in our past I think is pretty well known as we received a Warning Letter for our Rocky [and] Clayton facilities, it happened in 2010. ***And when that Warning Letter was received we developed a very robust action plan. We kicked off a quality transformation effort across both Rocky [and] Clayton and the rest of our pharmaceutical business as well as our MMS platforms. And that quality transformation plan was rolled through operations.***

*The robust action plans that were developed in Rocky and Clayton were tracked, as Mike likes to say, here at the Ivory Tower, we were measuring and reporting and had green, yellow and red graphs. But the proof's going to be in the pudding when you come to transformation. And what we saw was a mixed bag of results. . . when we got to the Rocky Mount reinspection, we were not only disappointed, we were somewhat surprised. That same kind of rigor had not stuck in Rocky.*

We're fighting a different animal. It's a very complex plant. *We're trying to drive remediation at the same time we're trying to drive very robust cost-savings programs. And we found those things competing with each other. There was a lack of clear focus in Rocky Mount. And the FDA though, and we subsequently received, additional Form 483 observations in our most recent audit.*

\* \* \*

We're pulling together our next phase of improvement plans, and we'll be sharing those with the FDA *over the next few years*.

\* \* \*

The next area is our comprehensive MMS remediation . . . . *And we see this as being a two to three-year process between our pharma remediation at Rocky Mount, as well as our MMC remediation, we think this will take us two to three years and be in the neighborhood of $200 million to $250 million.*

77.     Discussing inventory issues, a Company representative stated during the investor presentation:

I think that the biggest issues that we're seeing to date, a lot of the inventory we've seen, that's increased over the last 12 months, has been driven by this performance from the Rocky Mount facility. A lot of it is tied up in this classification we call WIP, work-in-progress.

*So it's been produced, but it hasn't yet been released for sale into the marketplace. And this delay in cycle time, this increase in cycle time, has driven that tranche of inventory up pretty significantly. And at a big plant like Rocky Mount, that's impacting our performance. The good news is, though, it's not impacting service levels today. Because of the decision to raise finished goods inventory levels, we've been able to absorb that and still continue to serve the market.*

78.     Responding to the statements made during the investor day, on September 8, 2011, analysts from The Buckingham Research Group stated, "While Hospira indicated that it believes that the FDA is working on a collaborative basis with the Company, its remediation of Rocky Mount is a

work in progress and the Company did admit that Project Fuel cost-cutting priorities were partly

responsible for taking focus off manufacturing quality issues." Likewise, JP Morgan analysts stated:

> While some significant initial improvements will take place over the next 6 months, Hospira anticipates it will take 2-3 years to fully remediate the issues at Rocky Mount. From a cost perspective, between Rocky Mount and the MMS fixes, these improvements are expected to cost $200-$250 mm, of which roughly 70%-75% is expected to be one-time in nature. While this is clearly necessary spend and hopefully will address the company's manufacturing challenges, today's updates reflect a significant increase in cost and time associated with remediation.

79.     On September 13, 2011, Barclays Capital downgraded Hospira from "Overweight" to

"Equal Weight" and cut the Company's price target from $64.00 to $44.00.

80.     On October 18, 2011, Hospira issued a press release reporting the Company's

preliminary third quarter 2011 financial results, which revealed a significant, unexpected change in

the Company's financial condition. The Company's third-quarter 2011 net sales, adjusted income

from operations and adjusted earnings per share were *significantly lower* than anticipated due to

"quality actions taken in response to a U.S. Food and Drug Administration (FDA) 2010 warning

letter and subsequent observations related to the company's manufacturing facility in Rocky Mount,

North Carolina, and device quality and supply-related issues." The press release revealed, in part:

> "While recently launched product sales continue to drive top-line growth, we were extremely disappointed in the third quarter by developments related to *our quality-improvement initiatives that resulted in a significant slowdown of production and an associated impact on our operating performance*," said F. Michael Ball, chief executive officer. "As I indicated at our Investor Day in early September, addressing these issues is Hospira's top priority, and our organization is committed to full resolution. I remain confident that Hospira will emerge from this process a stronger, more competitive global company that is optimally positioned to serve the needs of our customers and patients, and deliver strong value to our shareholders."

> Preliminary net sales for the quarter were $977 million, an increase of 2.9 percent compared to $949 million in the third quarter of 2010, with the increase primarily driven by continued strong U.S. net sales of the oncolytic docetaxel. On a constant-currency basis, third-quarter net sales increased slightly compared to the third-quarter of 2010.

> *Preliminary adjusted\* income from operations for the third quarter of 2011 was $142 million compared to $189 million in the third quarter of 2010. The decline is*

*primarily due to charges and costs associated with the quality actions and related inventory losses*. Preliminary adjusted* diluted earnings per share were $0.66 for the third quarter of 2011.

On a U.S. Generally Accepted Accounting Principles (GAAP) basis, *the company had a preliminary loss from operations of $85 million in the third quarter of 2011 compared to income from operations of $142 million in the third quarter of 2010*. The third quarter of 2011 includes a preliminary goodwill impairment charge related to Hospira's European operating unit identified during Hospira's annual impairment test. On a GAAP basis, *the company had a preliminary diluted loss per share of $0.54 compared to diluted earnings per share of $0.42 in the prior-year third quarter*. Results under GAAP include items as detailed in the schedule attached to this press release.

*       *       *

**2011 Projections**

*Given the preliminary third-quarter results, Hospira currently estimates that its adjusted\* diluted earnings per share for full-year 2011 will range between $2.95 and $3.05 per share, or $1.40 to $1.50 on a GAAP basis. These estimates are preliminary. Hospira will discuss its full-year 2011 projections in further detail when it reports its final third-quarter 2011 results on October 26, 2011.*

81.     The market reacted quickly to the surprisingly negative news. After closing at $37.36 on October 17, 2011, the stock dropped 21%, or $7.85 per share, to close at $29.51 on October 18, 2011, on heavy volume or more than 21 million shares traded.

82.     Market commentators also reacted to the Company's preliminary financial results. On October 18, 2011, the *Financial Times* published an article entitled "Hospira hit by production disruption." The article, which discussed the impact of the FDA's investigation on Hospira business, stated, in relevant part:

> More than $1 [billion] was wiped off the market capitalisation [sic] of pharmaceutical company Hospira on Tuesday, after the firm said [an FDA] investigation is affecting output from its main manufacturing plant.

> The Illinois-based firm, which provides hospitals with ready-made injections, saw shares fall 21 per cent to $29.51, after Hospira said "production slowed significantly" at its Rocky Mount, North Carolina plant.

- 48 -

*On a specially arranged conference call, the company said its service level – the percentage of customer orders it meets – fell from the mid 90s to the high 80s during the quarter to the end of September, resulting in lost sales.*

*As recently as September 7, Hospira had said service levels were improving as a result of higher productivity at the Rocky Mount site.*

"***This raises significant new credibility issues for the management***," said Gregory Hertz, healthcare analyst at Citibank.

\*          \*          \*

Michael Ball, Hospira's chief executive, told analysts on Tuesday's call that he had changed management and hired consultants to resolve issues at the facility. But the resulting new production-line and final product checks have significantly slowed output, while several batches of output have been written off because of quality concerns.

"Until there is more clarity around how big this issue is and when we might see a resolution, the share price will stay depressed and may even fall lower," said Matthew Taylor, healthcare analyst at Barclays Capital.

\*          \*          \*

But Mr. Hertz warned output may not recover to previous levels: "***My interpretation, having read the correspondence, is that the FDA things the Rocky Mount plant has reached the end of its useful life, which would have serious long-term consequences for Hospira***."

Analysts also warned that the firm's focus on the Rocky Mount plant has distracted from a multiyear efficiency drive across the company, which had delivered significant savings in the last two years.

The production problems mean revenue in the three months to the end of September is likely to be barely higher than the same quarter last year. Earnings per share are expected to fall 11 per cent from a year ago to 66 cents. Hospira also reduced guidance for full-year earnings to $3 from $3.95.

83.     Analysts reacted negatively as well, with Citigroup cutting Hospira's price target to $39.00, and putting a "hold" rating on Hospira stock, and analysts from Ticonderoga downgrading the Company from "buy" to a "neutral" rating. JP Morgan analysts pointed to the fact that the "company offered little clarity on the timing of resolution of these issues" and stated "we are not expecting a near-term recovery in the stock." On October 25, 2011, Zacks Investment Research analysts downgraded Hospira to "underperform" from "neutral," stating:

Hospira's third quarter preliminary results were below expectations due to continued manufacturing problems at the company's Rocky Mountain facility. The facility is expected to continue functioning below full capacity through the remainder of 2011. The additional costs for manufacturing remediation resulted in lost sales, inventory loss and lower service levels. In addition, management cut its 2011 adjusted earnings guidance to $2.95-$3.05 from $3.90-$4.00. We have slashed our 2011 earnings estimate from $3.93 to $3.01 and our 2012 estimates from $4.47 to $2.85, in line with management's action. Moreover, the Symbiq and Plum pump issues remain matters of concern. We have, therefore, downgraded our rating on Hospira from Neutral to Underperform.

84. Following the close of the Class Period, on October 26, 2011, the Company issued a press release reporting its third quarter results for the three months ended September 30, 2011. The press release stated, in part:

### 2011 Projections

**As a result of the lower-than-expected third-quarter results, the company now projects net sales for full-year 2011 to increase approximately 1 to 2 percent on a constant-currency basis. On a reported basis, the company expects full-year 2011 net sales growth of 2 to 3 percent.**

**As the company announced on Oct. 18, 2011, adjusted\* diluted earnings per share for full-year 2011 are expected to range between $2.95 and $3.05.**

85. Also on October 26, 2011, Hospira filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2011. The Company's Form 10-Q reiterated the Company's financial results, was signed by Werner, and contained required SOX certifications signed by Werner and Ball. The Form 10-Q further discussed the Company's "Certain Quality and Product Related Matters," and stated in part:

In January 2011, the FDA completed a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the Warning Letter. The FDA did not issue a Form 483 of any potentially objectionable conditions related to the Clayton inspection. The FDA completed a follow-up inspection at the Rocky Mount facility in June 2011, and issued a Form 483 listing observations related to certain quality systems, facilities, and operating procedures. In August 2011, the FDA completed an additional inspection at the Rocky Mount facility, which resulted in additional Form 483 observations that identified further areas for remediation and improvement. *Hospira is implementing a comprehensive remediation plan, including obtaining the assistance of third party subject matter experts to help Hospira address the FDA's concerns. Hospira has implemented*

*certain interim oversight controls, including third party oversight; product assessments; retrospective reviews of laboratory results related to out of specification findings and investigations; and the development and implementation of a comprehensive laboratory action plan. Hospira also has implemented significant management changes to the Rocky Mount facility's leadership team.*

\* \* \*

For the historical period from the beginning of these matters through the period ended June 30, 2011, Hospira had incurred approximately $90.7 million of charges for these quality and product related matters referenced above. In addition, beginning with the three months ended September 30 2011, *Hospira expects to incur over the next two to three years, aggregate pre-tax charges related to these quality and product related matters in the range of $300 million to $375 million*, of which Hospira incurred an aggregate of $52.4 million in the three months ended September 30, 2011. The amount, timing and recognition of charges associated with these matters over this time period will be affected by the nature of spending and the occurrence of commitments and triggering events as defined under GAAP, among other factors. Further, costs for long-term solutions and product improvements will depend on various product development efforts and corresponding regulatory outcomes in connection therewith. Also, capital expenditures to remediate and/or enhance Hospira's existing facilities and operations may be required. See matters discussed in section "Facilities Optimization and Capacity Expansion" in Item 2.

86. Also on October 26, 2011, the Company hosted a conference call to discuss its third quarter 2011 financial results. During the call, *Hospira estimated that its remediation costs would be between $300 million and $375 million over three years*, that the Company was seeing "bottlenecks" at its Rocky Mount plant, and that the Company remained unable to lay out remediation deadlines. The Company also revealed that it had broadened the scope of its remediation investigation to look at all of its plants, and that the FDA was examining the Company's Austin, Texas plant, which accounted for approximately 10% of the Company's sales, and that "*the FDA is likely not only just withholding approval to products coming out of Rocky [Mount], but are most likely doing the same at Austin*."

87. The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Hospira suffered from extensive quality control issues throughout the Class Period, which undermined both the viability of and the supposed financial savings that would be generated by Project Fuel;

(b)    Defendants failed to disclose the extent of the Company's inability to comply with problems identified in FDA Warning Letters related to Hospira's infusion pumps, quality control deficiencies, and manufacturing weaknesses;

(c)    Hospira's revenue guidance for 2010 and 2011 was misstated and lacked a reasonable basis when made; and

(d)    As a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

88.    As a result of defendants' false statements and omissions, Hospira common stock traded at artificially inflated prices during the Class Period. After the above revelations were revealed to the market, however, the Company's shares were hammered by massive sales, sending them down approximately *50.6%* from their Class Period high.

## ADDITIONAL SCIENTER ALLEGATIONS

89.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Hospira, their control over, and/or receipt and/or modification of Hospira allegedly materially misleading misstatements and/or their associations with

the Company which made them privy to confidential proprietary information concerning Hospira, participated in the fraudulent scheme alleged herein.

90.     During the Class period, the artificially inflated price of Hospira common stock directly benefitted Werner and Begley.   Specifically, Werner sold 85,849 shares of his Hospira common stock at prices ranging between $53.71 and $59.50 per share for insider trading proceeds of more than $4.9 million.   Begley sold 386,112 shares of his Hospira common stock at $57.00 per share for insider trading proceeds of more than $22 million.

## LOSS CAUSATION/ECONOMIC LOSS

91.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Hospira common stock and operated as a fraud or deceit on Class Period purchasers of Hospira common stock by failing to disclose and misrepresenting the adverse facts detailed herein.   When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market through partial disclosures, the price of Hospira common stock fell precipitously as the prior artificial inflation came out.   As a result of their purchases of Hospira common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about Hospira was revealed through a series of partial disclosures that removed the artificial inflation from the price of Hospira common stock.

92.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of Hospira's business and prospects.   Defendants' false and misleading statements had the intended effect and caused Hospira common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $59.75 per share on July 14, 2010.

93.     As a direct result of the disclosures identified herein, the price of Hospira common stock fell precipitously.  This removed the artificial inflation from the price of Hospira common stock, causing real economic loss to investors who had purchased Hospira common stock at artificially inflated prices during the Class Period.

94.     The declines were a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines in Hospira common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Hospira common stock and the subsequent significant declines in the value of Hospira common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

95.     At all relevant times, the market for Hospira common stock was an efficient market for the following reasons, among others:

(a)     Hospira common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Hospira filed periodic public reports with the SEC and the NYSE;

(c)     Hospira regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Hospira was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

96.     As a result of the foregoing, the market for Hospira common stock promptly digested current information regarding Hospira from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Hospira common stock during the Class Period suffered similar injury through their purchase of Hospira common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

97.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hospira who knew that those statements were false when made.

## COUNT I

### FOR VIOLATION OF SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 AGAINST ALL DEFENDANTS

98.     Plaintiff incorporates ¶¶1-97 by reference.

- 55 -

99.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

100.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Hospira common stock during the Class Period.

101.    By virtue of the foregoing, Hospira and the Individual Defendants have each violated §10b of the 1934 Act, and Rule 10b-5 promulgated thereunder.

102.    As a direct result and proximate result of defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Hospira stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Hospira common stock and experienced loses when the artificial inflation was released from Hospira stock as a result of the partial revelations and stock price decline detailed herein.  Plaintiff and the Class would not have purchased Hospira common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### FOR VIOLATION OF SECTION 20(a) OF THE 1934 ACT
### AGAINST INDIVIDUAL DEFENDANTS

103.    Plaintiff incorporates ¶¶1-97 by reference.

104.    The Individual Defendants acted as controlling persons of Hospira within the meaning of §20(a) of the 1934 Act.  By reason of their controlling positions with the Company, the Individual Defendants had the power and authority to cause Hospira to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)    Awarding Plaintiff and the members of the Class damages, including interest;

(c)    Awarding Plaintiff reasonable costs and attorneys' fees; and

(d)    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 21, 2011          WEXLER WALLACE LLP


                            s/ Kara A. Elgersma
                            KARA A. ELGERSMA

Kenneth A. Wexler
Edward A. Wallace
Kara A. Elgersma
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone 312/346-2222
312/346-0022 (fax)
kaw@wexlerwallace.com
eaw@wexlerwallace.com
kae@wexlerwallace.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
Paul J. Geller
Jack Reise
Robert J. Robbins
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com

VANOVERBEKE MICHAUD & TIMMONY,
   P.C.
Michael J. Vanoverbeke
Thomas C. Michaud
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)