UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF STERLING HEIGHTS GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | No. 1:11-cv-08332-AJS **(Consolidated)** <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | <u>Hon. Amy J. St. Eve</u> |
| HOSPIRA, INC., *et al.*, | ) ) | |
| Defendants. | ) ) ) ) | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**[REDACTED VERSION]**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.    FACTUAL BACKGROUND...........................................................................2

III.    PROCEDURAL BACKGROUND..................................................................7

IV.    ARGUMENT ...................................................................................................7

      A.    Legal Standards...................................................................................7

      B.    The Proposed Class Satisfies Rule 23(a) ...........................................9

            1.    The Members of the Class Are So Numerous that Joinder of All Members Is Impracticable...........................................9

            2.    Questions of Law and Fact Are Common to the Class.............10

            3.    Lead Plaintiffs' Claims Are Typical of Those of the Class ......11

            4.    Lead Plaintiffs and Co-Lead Counsel Will Fairly and Adequately Prosecute the Case on Behalf of the Proposed Class................................13

      C.    The Proposed Class Satisfies Rule 23(b)(3) .........................................14

            1.    Common Questions of Law and Fact Predominate ..................14

             2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy.......................................21

      D.    The Court Should Appoint Co-Lead Counsel as Class Counsel Under Rule 23(g) .............................................................................22

V.    CONCLUSION................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens v. U.S.*,
  406 U.S. 128 (1972)................................................................................21

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................8, 14

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  __ U.S. __, 133 S. Ct. 1184 (2013)....................................................8, 16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................8, 16

*Billhofer v. Flamel Tech., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ............................................................20

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ................................................. *passim*

*Comcast Corp. v. Behrend*,
  __ U.S. __, 133 S. Ct. 1426 (2013)........................................................15

*Computer Scis. Corp. Sec. Litig.*,
  288 F.R.D. 112 (E.D. Va. 2012) .............................................................17

*De La Fuente v. Stokely-Van Camp, Inc.*,
  713 F.2d 225 (7th Cir. 1983) ..................................................................12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  __ U.S. __, 131 S. Ct. 2179 (2011)..................................................15, 20

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982)................................................................................12

*Harris v. comScore, Inc.*,
  No. 11-5807, 2013 U.S. Dist. LEXIS 47399 (N.D. Ill. Apr. 2, 2013) ....................................15

*In re Bank One Sec. Litig./First Chi. S'holder Claims*,
  No. 00-0767, 2002 U.S. Dist. LEXIS 8709 (N.D. Ill. May 14, 2002)...............................15, 21

*In re NeoPharm, Inc. Sec. Litig.*,
  225 F.R.D. 563 (N.D. Ill. 2004)......................................................9, 11, 12

ii

**Page**

*In re Sys. Software Assocs., Inc. Sec. Litig.*,
No. 97-177, 2000 U.S. Dist. LEXIS 18285 (N.D. Ill. Dec. 8, 2000) ................................. 9, 15

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ........................................................................................ 10, 11

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................................... 20

*Levitan v. McCoy*,
No. 00-5096, 2003 U.S. Dist. LEXIS 5078 (N.D. Ill. Mar. 31, 2003) ............................. 9, 21

*Messner v. Northshore Univ. Healthsystem*,
669 F.3d 802 (7th Cir. 2012) ............................................................................................. 14

*Nauman v. Abbott Labs.*,
No. 04-7199, 2007 U.S. Dist. LEXIS 25069 (N.D. Ill. Apr. 3, 2007) ................................. 10

*Neil v. Zell*,
275 F.R.D. 256 (N.D. Ill. 2011) ........................................................................................... 9

*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir. 1992) ..................................................................................... 10, 13

*Roth v. Aon Corp.*,
238 F.R.D. 603 (N.D. Ill. 2006) ............................................................................... 8, 10, 11

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ...................................................................... 9, 16, 17, 18

*Schleicher v. Wendt*,
No. 02-1332, 2009 U.S. Dist. LEXIS 24810 (S.D. Ind. Mar. 20, 2009) .......................... 15, 17

*Silverman v. Motorola, Inc.*,
259 F.R.D. 163 (N.D. Ill. 2009) ........................................................................ 10, 11, 13, 16

*Tatz v. Nanophase Tech. Corp.*,
No. 01-8440, 2003 U.S. Dist. LEXIS 9982 (N.D. Ill. June 13, 2003) ............................ *passim*

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
No. 05-1898, 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006) ............................ 17, 19

*Wal-Mart Stores, Inc. v. Dukes*,
__ U.S. __, 131 S. Ct. 2541 (2011) ..................................................................................... 8

**Page**

*Wright v. Heizer Corp.*,
    560 F.2d 236 (7th Cir. 1977) .....................................................................................21

Lead Plaintiffs the Sheet Metal Workers' National Pension Fund, KBC Asset Management NV, the Heavy & General Laborers' Locals 472 & 172 Pension & Annuity Funds, and the Roofers Local No. 149 Pension Fund (collectively, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Class Certification pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

## I.    PRELIMINARY STATEMENT

This securities fraud action against a multinational corporation whose shares trade on the New York Stock Exchange ("NYSE") is precisely the type of action routinely certified as a class action by courts in this District and elsewhere around the country.  Lead Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), by Hospira, Inc. ("Hospira" or the "Company") and three of its current and former executives ("Individual Defendants") (collectively, "Defendants").  The Third Amended Consolidated Class Action Complaint ("Complaint") [Dkt. No. 118] alleges that Defendants engaged in a fraudulent scheme to artificially inflate Hospira's stock price by concealing (1) widespread manufacturing and quality control ("QC") deficiencies at the Company's largest pharmaceuticals production facility, and (2) the true impact of a Company-wide "optimization" initiative on Hospira's deteriorating facilities and QC efforts.  Lead Plaintiffs seek certification of a class consisting of all those who purchased or otherwise acquired Hospira's publicly traded common stock between February 4, 2010, and October 17, 2011, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[1]

---

[1]    Excluded from the proposed Class are: (1) any Defendant in this action; (2) Hospira's officers and directors; (3) members of the Individual Defendants' immediate families; (4) any entity in which Defendants have or had a controlling interest; and (5) the legal representatives, heirs, successors, or assigns of any such excluded party.

Class certification is particularly appropriate here because, during the Class Period, hundreds of millions of Hospira shares were outstanding and publicly traded in an efficient market on the NYSE, as confirmed by Lead Plaintiffs' expert, Dr. John D. Finnerty. Consequently, numerous Hospira shareholders were similarly damaged by Defendants' alleged course of conduct and thus have claims sharing common questions of law and fact that predominate this action. Given the shareholders' geographic dispersion and relatively small investments in Hospira, a class action represents the best, if not the only practical, means of securing them any meaningful redress. Further, Lead Plaintiffs share claims typical of the Class and are fully capable of and committed to fulfilling their obligations on behalf of absent Class members, as demonstrated by their retention of highly experienced class counsel to vigorously prosecute this action.

As demonstrated below, Lead Plaintiffs and the proposed Class satisfy all of the prerequisites of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Accordingly, the proposed Class should be certified, and Lead Plaintiffs should be appointed as representatives and Co-Lead Counsel as counsel for the Class.

## II. FACTUAL BACKGROUND

Hospira manufactures pharmaceuticals and medical devices for patients all over the world. ¶35.[2] The Company has production facilities around the globe, but the "crown jewel" of its manufacturing empire is located right here in the United States, in Rocky Mount, North Carolina. ¶38. Rocky Mount's manufacturing plant and three laboratories cover one million square feet, employ as many as 2,500 people, and produce enough pharmaceuticals to account for 25% of the Company's $4 billion in annual revenue. *Id.*

---

[2] Citations to "¶__" refer to paragraphs in the Complaint.

A necessary aspect of Hospira's pharmaceuticals manufacturing business is regulatory oversight by the U.S. Food and Drug Administration ("FDA"). As a result of a series of short-sighted budget cuts, staff lay-offs, and utter disregard for the safety and quality of its output, Rocky Mount saw more than its fair share of FDA scrutiny during the Class Period. Facilities are typically inspected once every three years, though visits may become more frequent when the FDA has reason for concern. ¶104. Rocky Mount was inspected at least *five* times between August 2009 and August 2011. ¶106. One such inspection in January 2010 resulted in the issuance of a formal FDA Warning Letter for the facility's "significant violations of Current Good Manufacturing Practice (CGMP) regulations." ¶108. Among the FDA's concerns were Rocky Mount's inadequate written procedures for production and process controls, inadequate validation of drug mixing processes, and failure to report adverse events to the FDA. *Id*. The FDA warned "[i]t is apparent that Hospira's attempts to implement global corrective actions after past regulatory actions by the FDA have been inadequate. Be advised that corporate management has the responsibility to ensure the quality, safety, and integrity of its drug products and devices." ¶110.

Defendants failed to take the necessary corrective actions, and, in fact, the problems got worse at Rocky Mount throughout the Class Period. ¶¶66-67, 86-87. Equipment used in the production of pharmaceuticals was outdated, failing validation, breaking down, and in some instances "jerry-rigged" by plant employees just to keep it operational. ¶¶88-93. In addition to the mechanical issues, equipment was routinely pushed beyond its limits so that management could run production lines at excess speeds to meet production quotas, regardless of the effect on quality levels and rejected product. ¶¶62-63. Solutions were mixed improperly due to understaffing, inadequate staff training, and unreliable mixing procedures. ¶¶64, 88-89. Process validation and QC testing failed to meet even baseline standards, and efforts during the Class Period to remediate these

problems fell flat due to staff shortages, budget cuts, and the need for serious, deep-rooted cultural change at the facility. ¶¶68-82.

A significant contributor to these and other problems at Rocky Mount was Project Fuel, Hospira's corporate-wide two-year "optimization" initiative launched in March 2009, roughly a year before the start of the Class Period. Project Fuel was hyped "to increase shareholder value and improve operational efficiency by optimizing [Hospira's] product line, evaluating non-strategic assets and streamlining its organizational structure." ¶45. In practical terms, this meant significant workforce and budget reductions leading up to and during the Class Period. ¶¶45-46. Quality control at Rocky Mount – the Company's largest manufacturing facility – was hit particularly hard. ¶¶51-58, 60-61, 70-71. Former employees described Project Fuel as "nothing but a cost-cutting measure" that was "unethical" for "put[ting] money in front of medicine." ¶¶51-52.

Defendants were in constant contact with the FDA during the Class Period, and Defendants closely followed Rocky Mount's purported remediation efforts following receipt of the FDA's Warning Letter. ¶¶128-40. They knew, or, at a minimum, were reckless in not knowing, of Rocky Mount's widespread operational deficiencies. *Id*. Despite this, Defendants repeatedly assured the market that Hospira was "working diligently and aggressively" to address the FDA's concerns, that the Company's "quality issues" were "largely behind us," that Rocky Mount's problems were not "systemic issues to Hospira," that the Company's "facilities and equipment [we]re in good operating condition and [we]re well maintained," and that Project Fuel had been put in place to "drive quality and operational excellence." ¶8.

Yet, despite these confident assurances to the public, as the limited discovery received in this case has already shown, at the same time Defendants were making these rosy (and false and misleading) statements, they were ███████████████████████████ For example, Defendant

4

Thomas E. Werner ("Werner") wrote in a memo, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Ex. A at HOSPIRA00031402.  Werner lamented

internally that ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ *Id.*  Werner complained that the ████████████████████

████████████████████████████ *Id.* at HOSPIRA00031403.  As for the publicly

touted Project Fuel, Werner frankly stated, ████████████████████████████

████████████████████████████████████ *Id.* at HOSPIRA00031402.

As further example, despite Defendants' more positive statements about Hospira's financial

performance and quality improvements in 2010, Werner privately said, ████████████████████

████████████████████████████████████████████████████

████████ Ex. B at HOSPIRA00030886.  Werner was not alone in these views, as many other

employees ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Ex. C at HOSPIRA00001450.  Another employee stated,

████████████████████████████████████████████████████

████████████████████████ *Id.* at HOSPIRA00001450.

Early in the Class Period, employees expressed ████████████████████████

████████████████████████████████████ Ex. D at HOSPIRA00023988.

Similarly, contrary to Defendants' repeated false statements during the Class Period that equipment was well maintained, employees ███████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ Ex. C at HOSPIRA00001450.

The results of years of neglect at Rocky Mount, only exacerbated by Project Fuel's staff and budget cuts, finally began to come to light on September 7, 2011, at Hospira's "Investor Day" conference. There, the Company spoke "a little bit more openly" about the serious manufacturing problems plaguing its most important facility. ¶221. Hospira revealed that Rocky Mount needed significant remediation, to the tune of $200-$250 million over two-to-three years, "to make some investments in modernization" in light of its "aged facilities." ¶¶221-22. Defendants admitted to having been "a little lazy" with regard to Rocky Mount, and that they had been "kind of skating behind the puck[,] and [that] it was time for [them] to get caught up and . . . to take on a new mentality and a different approach." ¶222. The market was rightfully concerned, and Hospira's share price fell approximately 13% in the days following this revelation. ¶10.

Further details on Rocky Mount's necessary remediation efforts shocked the market once again on October 18, 2011, when the Company disclosed that remediation would actually cost even more than initially forecasted (investors later learned this bill could reach $375 million). ¶11. More importantly, the undisclosed operational failures were now impacting not just expenses but also revenues, as Hospira's customer service levels had "dramatically reversed," causing disappointing preliminary third quarter 2011 financial results. *Id*. The Company's net sales, operating income, and earnings per share all had suffered due to a production slowdown at Rocky Mount caused by the plant's ongoing remediation and quality-improvement efforts. *Id*. In short, Rocky Mount's operational woes were now impacting the Company's ability to fill orders, and it was not clear how

6

long this would continue. With current and future sales now in jeopardy, Hospira's stock price plummeted by 21% on October 18, 2011, causing millions in investor losses.

The share price fell yet again after a post-Class Period revelation on November 28, 2011. News broke that "Hospira's manufacturing issues are far greater than investors realize," and that "the widespread nature of the [FDA] violations demonstrat[e] that there may be a more systemic issue that will have to be rectified long term." ¶12. The stock was down 9% the following day on investors' deepening concerns. *Id*.

## III. PROCEDURAL BACKGROUND

This action was filed on November 21, 2011, by plaintiff City of Sterling Heights General Employees' Retirement System [Dkt. No. 1] and consolidated with a related securities fraud action on February 1, 2012 [Dkt. No. 51]. On April 18, 2012, Lead Plaintiffs were appointed by the Court, along with their selection of Motley Rice LLC ("Motley Rice") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Co-Lead Counsel [Dkt. No. 63]. Weeks later, on June 25, 2012, Lead Plaintiffs filed their Amended Consolidated Class Action Complaint [Dkt. No. 75]. The Defendants moved to dismiss that complaint on August 27, 2012 [Dkt. Nos. 85-87].

The Court issued a Memorandum Opinion and Order on February 13, 2013, granting in part and denying in part the motion to dismiss [Dkt. No. 103]. The Complaint was filed on April 15, 2013, to conform to the Court's Memorandum Opinion and Order, and the parties have now proceeded with discovery.

## IV. ARGUMENT

### A. Legal Standards

Rule 23(a) of the Federal Rules of Civil Procedure permits class treatment where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the

7

claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  In addition, a class action must satisfy at least one of the three conditions imposed by Rule 23(b).  Here, Lead Plaintiffs move for class certification under Rule 23(b)(3), which permits certification where (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

In determining whether class certification is appropriate, courts are to focus on the limited question of whether the prerequisites of Rule 23 are satisfied.  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, __ U.S. __, 133 S. Ct. 1184, 1194-95 (2013). While a court's class certification analysis must be "rigorous," *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 (2011), a court may consider merits questions only to the limited extent that they overlap with the prerequisites of Rule 23.  *Amgen*, 133 S. Ct. at 1194-95.  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Id.* [3]

The Supreme Court has recognized that securities fraud cases are routinely certified.  *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("[p]redominance is a test readily met in certain cases alleging . . . securities fraud"); *Basic Inc. v. Levinson*, 485 U.S. 224, 250 (1988) (noting that a class action is the most favorable means of adjudicating federal securities fraud claims).  In the Seventh Circuit, there is a "strong policy favoring class certification" in securities actions, and Rule 23 is therefore "liberally construe[d]."  *Roth v. Aon Corp.*, 238 F.R.D. 603, 605-06 (N.D. Ill. 2006) (Norgle, J.); *see also Tatz v. Nanophase Tech. Corp.*, No. 01-8440, 2003 U.S. Dist. LEXIS 9982, at *8 (N.D. Ill. June 13, 2003).

---

[3]    Citations, internal quotations, and footnotes are omitted, and emphasis is added, unless noted otherwise.

This policy is rooted in the fact that "securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing." *Levitan v. McCoy*, No. 00-5096, 2003 U.S. Dist. LEXIS 5078, at *6 (N.D. Ill. Mar. 31, 2003). As the Seventh Circuit simply put it, "[w]hen a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action." *Schleicher v. Wendt*, 618 F.3d 679, 681-82 (7th Cir. 2010).

**B.      The Proposed Class Satisfies Rule 23(a)**

**1.      The Members of the Class Are So Numerous that Joinder of All Members Is Impracticable**

Class certification is appropriate where the proposed class is so numerous that joinder of all its individual members would be impracticable. *See* Fed. R. Civ. P. 23(a)(1). To demonstrate numerosity under Rule 23(a)(1), a plaintiff is not required to identify the exact number of class members, and instead may rely on reasonable inferences drawn from available facts to estimate the size of the proposed class. *See Tatz*, 2003 U.S. Dist. LEXIS 9982, at *15 (inferring hundreds of class members based on 13 million shares traded over the entire relevant time period). Courts have found that classes with as few as 10 to 40 members are sufficient to satisfy numerosity. *Id*. at *14-15; *see also Neil v. Zell*, 275 F.R.D. 256, 260 (N.D. Ill. 2011) (Pallmeyer, J.) ("[a]lthough there is no 'bright line' test for numerosity, a class of forty is generally sufficient").

Moreover, in securities fraud lawsuits involving "nationally traded securities, numerosity may be assumed." *In re Sys. Software Assocs., Inc. Sec. Litig.*, No. 97-177, 2000 U.S. Dist. LEXIS 18285, at *4-*5 (N.D. Ill. Dec. 8, 2000) (Darrah, J.); *see also In re NeoPharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 565 (N.D. Ill. 2004) (Lefkow, J.) (numerosity satisfied where a stock was listed on a national

9

stock exchange (NASDAQ) and had over 16 million shares outstanding, creating a reasonable inference that "hundreds, if not thousands, of persons would be included in the proposed class").

Throughout the Class Period, Hospira had an average of approximately 166 million shares of common stock issued and outstanding, owned by hundreds, if not thousands, of geographically dispersed persons. *See* Decl. of John D. Finnerty, Ph.D. in Supp. of Lead Pls.' Mot. for Class Certification ("Finnerty Decl."), attached hereto as Ex. E, ¶20. Further, Hospira stock actively traded on the NYSE, the world's largest stock exchange, at an average weekly volume of over 6.4 million shares during the Class Period. *See id.* ¶19. As such, Defendants cannot legitimately dispute that there are at least hundreds, if not thousands, of members of the proposed Class, easily satisfying the numerosity requirement.

### 2. Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires that questions of law or fact are common to the class. "The commonality requirement is not difficult to meet" and "has been characterized as a low hurdle, easily surmounted." *Roth*, 238 F.R.D. at 606. To satisfy the commonality requirement, issues of fact do not need to be identical as to each class member. *See Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992) ("some factual variation among the class grievances will not defeat a class action"). Rather, commonality is usually met when a common nucleus of operative facts unites a class, particularly when defendants "have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Courts have held that "[c]ommonality requires the existence of only one common issue of law or fact." *Nauman v. Abbott Labs.*, No. 04-7199, 2007 U.S. Dist. LEXIS 25069, at *7 (N.D. Ill. Apr. 3, 2007) (Gettleman, J.).

Courts in this District routinely conclude that the commonality requirement is satisfied in securities fraud actions just like this one. *See, e.g.*, *Tatz*, 2003 U.S. Dist. LEXIS 9982, at *16-17; *Roth*, 238 F.R.D. at 609; *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 169 (N.D. Ill. 2009) (St. Eve, J.). In

such actions, courts find that common questions of law and fact are present where the alleged fraud involves a defendant corporation's false and misleading statements to the public that artificially inflated the corporation's stock price, and ultimately resulted in damages sustained by the corporation's stockholders. *See Tatz*, 2003 U.S. Dist. LEXIS 9982, at *2-8, *16-17; *Roth*, 238 F.R.D. at 605, 608; *Motorola*, 259 F.R.D. at 166-67, 169.

This case involves the same types of legal and factual questions that satisfied the commonality standard in the securities cases cited above, deriving from Defendants' "standardized conduct towards members of the proposed class." *Keele*, 149 F.3d at 594. These questions include, *inter alia*: (1) whether Defendants knowingly or recklessly made public statements that misrepresented or omitted material facts about Hospira's manufacturing operations, QC efforts, facility and equipment conditions, and company-wide "optimization" initiative; (2) whether the price of Hospira common stock was artificially inflated by Defendants' misrepresentations and omissions; (3) whether the Class members sustained damages as a result of the decline in the value of Hospira common stock when the truth was revealed (and the appropriate measure of such damages); and (4) whether Defendants' conduct violated the Exchange Act. *See* ¶¶39-272. It follows that evidentiary proof of such claims will necessarily be common to all Class members, and that such claims are capable of Class-wide resolution. Therefore, the Class claims in this case easily meet the commonality standard under Rule 23(a)(2).

### 3. Lead Plaintiffs' Claims Are Typical of Those of the Class

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Courts "liberally construe" the typicality requirement. *Roth*, 238 F.R.D. at 606. A class representative's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *NeoPharm*, 225 F.R.D. at 566. Typicality does not require that each class member

11

"suffer exactly the same injury" as the class representative. *Tatz*, 2003 U.S. Dist. LEXIS 9982, at *18. Rather, typicality may be satisfied "even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente v. Stokely-Van Camp, Inc*., 713 F.2d 225, 232 (7th Cir. 1983). As the Supreme Court has observed, the commonality and typicality requirements "tend to merge. Both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). Therefore, "[a] finding that commonality exists generally results in a finding that typicality also exists." *Tatz*, 2003 U.S. Dist. LEXIS 9982, at *18.

The claims here satisfy the typicality requirement because they "arise[] from the same . . . course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *NeoPharm*, 225 F.R.D. at 566. Like all members of the Class, Lead Plaintiffs purchased Hospira common stock during the Class Period. *See* Decls. on behalf of Lead Pls. (collectively, "Lead Pl. Decls."), attached hereto as Exs. F-I, ¶3, Ex. 1. As Hospira stockholders, Lead Plaintiffs and all other Class members share virtually identical claims against Defendants, based on the same legal theory that Defendants violated the Exchange Act by knowingly or recklessly making materially false and misleading statements or omitting material facts during the Class Period regarding Hospira's manufacturing operations, QC efforts, facility and equipment conditions, and Company-wide "optimization" initiative. *See id.*; ¶¶39-223. Likewise, the damages sought by Lead Plaintiffs and all other Class members arise from the purchase of Hospira stock at prices artificially inflated by Defendants' fraud, followed by the deflation of such stock prices when the truth was revealed to the market. *See* Lead Pl. Decls. ¶3, Ex. 1; ¶¶220-63. In all respects, Lead Plaintiffs' claims mirror the Class claims, and clearly are "typical" under Rule 23(a)(3).

### 4. Lead Plaintiffs and Co-Lead Counsel Will Fairly and Adequately Prosecute the Case on Behalf of the Proposed Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." To meet this standard, class representatives must show that: "(1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them." *Motorola*, 259 F.R.D. at 173 (citing *Rosario*, 963 F.2d at 1018). Meeting this standard is not difficult: "[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient." *Id.*

Lead Plaintiffs easily satisfy these adequacy standards, and are therefore qualified to represent the proposed Class. First, none of Lead Plaintiffs' interests are antagonistic to or in conflict with those of the Class. Rather, as discussed above, Lead Plaintiffs' interests are typical of all Class members. *See supra* §IV.B.3. Lead Plaintiffs allege claims arising from the same wrongful conduct and based on the same legal theory as the claims of all Class members. *Id.* Further, as a result of such wrongful conduct, Lead Plaintiffs collectively have suffered substantial losses of approximately $4.5 million. *See* Lead Pl. Decls. ¶3, Ex. 1. Lead Plaintiffs, therefore, have more than a sufficient interest in the outcome of the litigation to ensure vigorous advocacy.

Lead Plaintiffs also have demonstrated their adequacy during the course of this litigation to date. Lead Plaintiffs have vigorously represented the interests of the proposed Class, demonstrating their assertiveness, knowledge, and commitment with respect to the prosecution of this action. *See* Lead Pl. Decls. ¶4. As Class representatives, Lead Plaintiffs will continue to supervise and monitor the progress of this litigation and actively participate in its prosecution. *See id.* ¶¶5-8.

Finally, Lead Plaintiffs have demonstrated their adequacy by retaining legal counsel who are qualified and fully capable of prosecuting this litigation on behalf of the Class. On April 18, 2012,

the Court approved Motley Rice and Robbins Geller as Co-Lead Counsel in this action. Since that time, Motley Rice and Robbins Geller have worked vigorously to prosecute this case, including their successful opposition to Defendants' motion to dismiss this action. If appointed Class Counsel, Motley Rice and Robbins Geller will continue their strong advocacy on behalf of the Class, leveraging their extensive experience in the prosecution and resolution of complex securities fraud class actions like this one. *See* Exs. J, K (firm résumés of Motley Rice and Robbins Geller).

### C. The Proposed Class Satisfies Rule 23(b)(3)

Rule 23(b)(3) provides that an action may be maintained as a class action if the prerequisites of Rule 23(a) are satisfied (*see supra* §IV.B) and, in addition, "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Here, common questions of law and fact predominate, and a class action is the superior, if not the only, method available to fairly and efficiently litigate this securities fraud lawsuit.

### 1. Common Questions of Law and Fact Predominate

Rule 23(b)(3) requires that questions of law or fact common to the class predominate over issues particular to individual class members. Such common questions "need not be exclusive," but rather, like the commonality requirement under Rule 23(a), "courts look to whether there is a 'common nucleus of operative facts.'" *Tatz*, 2003 U.S. Dist. LEXIS 9982, at *26. As the Seventh Circuit recently observed, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 814-15 (7th Cir. 2012) (quoting *Amchem*, 521 U.S. at 625).

Here, the allegations of the proposed Class involve common issues that meet the predominance requirement under Rule 23(b)(3). Because all Class members will need to establish the same facts to demonstrate that Defendants' alleged misstatements and omissions violated the

Exchange Act, common questions of law and fact will predominate at trial. *See supra* §IV.B.2 (summarizing the facts and legal claims representing the common nucleus of every Class member's securities action against Defendants in this case); *see also In re Bank One Sec. Litig./First Chi. S'holder Claims*, No. 00-0767, 2002 U.S. Dist. LEXIS 8709, at *22 (N.D. Ill. May 14, 2002) ("The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue."); *Sys. Software*, 2000 U.S. Dist. LEXIS 18285, at *11 ("[t]he principal issues of law and fact relate to defendants' alleged misrepresentations" and "are common to the members of the class"). The predominant, Class-wide issues in this case far outweigh any conceivable individual issues.[4]

In securities fraud actions, defendants often challenge predominance in the context of whether the proposed class members commonly relied on defendants' misrepresentations. See *Erica P. John Fund, Inc. v. Halliburton Co.*, __ U.S. __, 131 S. Ct. 2179, 2184 (2011) ("Whether common questions of law or fact predominate . . . often turns on the element of reliance."). As detailed below, reliance is a common issue in this case because the entire Class is entitled to a presumption of reliance under the fraud-on-the-market doctrine.

---

[4]      The predominance of such Class-wide issues would not be defeated by any individual issues regarding damages. *See Schleicher v. Wendt*, No. 02-1332, 2009 U.S. Dist. LEXIS 24810, at *40 (S.D. Ind. Mar. 20, 2009) ("The need for such individual damage determinations does not necessarily defeat class certification."), *aff'd*, 618 F. 3d 679 (7th Cir. 2010); *Tatz*, 2003 U.S. Dist. LEXIS 9982, at *26 ("A court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate."); *see also Harris v. comScore, Inc.*, No. 11-5807, 2013 U.S. Dist. LEXIS 47399, at *32-33 n.9 (N.D. Ill. Apr. 2, 2013) (Holderman, C.J.) (rejecting the argument, based on "mere[] dicta" appearing in the Supreme Court's recent anti-trust decision, *Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426 (2013), that a common, class-wide methodology for measuring damages is a prerequisite to class certification).

### a. Lead Plaintiffs Are Entitled to a Presumption of Reliance Under the Fraud-on-the-Market Doctrine

The fraud-on-the-market doctrine dispenses with the requirement that each plaintiff prove his or her direct reliance on, or awareness of, a particular misstatement or omission. *Basic*, 485 U.S. at 241-47. Reliance instead may be presumed by a showing of market efficiency. *Id.* at 245-47. As the Supreme Court recently confirmed, "courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.'" *Amgen*, 133 S. Ct. at 1192-93 (quoting *Basic*, 485 U.S. at 245). Such presumption satisfies the Rule 23(b)(3) predominance requirement with respect to the element of reliance. *Id.* at 1193;[5] *see also Schleicher*, 618 F.3d at 682 ("When a company's stock trades in a large and efficient market . . . common questions predominate and class certification is routine, if a suitable representative steps forward."); *Motorola*, 259 F.R.D. at 174 ("[C]lass members need not prove reliance on an individualized basis – class reliance will be presumed – if plaintiffs can show that the alleged misrepresentation was materially and publicly transmitted into a well-developed market.").

### b. The Market for Hospira Stock Was Efficient Throughout the Class Period

During the Class Period, Hospira common stock traded in substantial volumes on the NYSE, one of the most liquid and efficient stock exchanges in the world. Numerous courts have concluded that a stock's inclusion on a national stock exchange such as the NYSE is a strong indicator of market efficiency. *See, e.g.*, *Schleicher*, 618 F.3d at 682 (defendant's NYSE-listed stock "comfortably

---

[5]     In *Amgen*, the Supreme Court also clarified that plaintiffs are not required to prove the materiality of a defendant's misrepresentations in order to invoke the presumption of reliance prior to class certification. 133 S. Ct. at 1195-97 ("[P]roof of materiality is not required prior to class certification because such proof is not necessary to ensure satisfaction of Rule 23(b)(3)'s predominance requirement.").

qualif[ied]" as efficient under the fraud-on-the-market doctrine); *Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (defendants "cited no case, and none has been found, holding that the NYSE is not an efficient market for shares of common stock traded, as here, in substantial volumes"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-1898, 2006 U.S. Dist. LEXIS 52991, at *43 (S.D.N.Y. Aug. 1, 2006) ("At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency. If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient.").

Although the market efficiency of the Company's stock cannot be seriously disputed, Lead Plaintiffs nevertheless have submitted Dr. Finnerty's expert report analyzing the market for Hospira common stock in the context of the five-factor test for market efficiency established in the seminal case, *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See* Ex. E. The five *Cammer* factors are routinely applied by federal courts to analyze market efficiency. *See, e.g.*, *Schleicher*, 2009 U.S. Dist. LEXIS 24810, at *13-14 ("[t]o determine whether a market is efficient enough to apply the fraud on the market theory, many courts have applied the so-called *Cammer* factors"). The five *Cammer* factors are summarized as follows and further analyzed in the sections below:

- whether the security traded at a large average weekly volume;

- whether a significant amount of analysts followed and reported on the security;

- whether the security had numerous market makers;

- whether the company was eligible to file on SEC Form S-3; and

- whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases and an immediate response in the security's price.

711 F. Supp. at 1286-87.

### (1) Hospira Shares Traded at a Large Average Weekly Volume

Hospira shares were actively traded throughout the Class Period, which is an indication of efficiency. The *Cammer* court found that "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." 711 F. Supp. at 1293. During the Class Period, the average weekly turnover of Hospira shares on the NYSE was approximately 3.89%, more than enough to "justify a strong presumption" of market efficiency under *Cammer*. *See id.*; Finnerty Decl. ¶¶19-20.

### (2) A Significant Number of Analysts Followed and Reported on Hospira Stock

During the Class Period, Hospira was followed by numerous securities analysts employed by major brokerage firms. Specifically, at least 19 securities firms employed analysts covering Hospira and its common stock, and an additional two securities or ratings firms employed credit analysts covering the Company's debt. *See* Finnerty Decl. ¶22. The presence of a substantial number of analysts indicates that Hospira stock was closely reviewed by investment professionals, who made buy/sell recommendations to investors based on information publicly available about the Company. *See Cammer*, 711 F. Supp. at 1286; Finnerty Decl. ¶23. This extensive analyst coverage, along with media coverage and information provided by the Company to the market through periodic SEC filings, press releases, and conference calls, supports a finding of efficiency. *See* ¶¶141-242, 273-78.

### (3) Hospira Stock Was Traded on the NYSE and Predominantly Owned by Institutional Investors During the Class Period

As noted above, Hospira shares traded on the NYSE at all pertinent times, which is viewed as a strong indicator of market efficiency. *See, e.g.*, *Schleicher*, 618 F.3d at 682. *Cammer* holds that the existence of numerous market makers ensures completion of the market mechanism and weighs

in favor of an efficient market. 711 F. Supp. at 1286-87. The NYSE meets that criteria, using numerous Designated Market Makers and other market participants to provide market stability and liquidity. *See Designated Market Makers*, NYX.com, http://usequities.nyx.com/listings/dmms (last visited August 9, 2013). Efficiency is also supported by the presence of at least 29 brokers who made a market for Hospira common stock during the Class Period. *See* Finnerty Decl. ¶26. Additionally, as disclosed in Schedule 13-F filings, institutional investors owned approximately 85%-91% of Hospira's outstanding shares during the Class Period, another strong indication that the Company's stock traded in an efficient market. *See id.* ¶25.

### (4) Hospira Was Eligible to File on SEC Form S-3 During the Class Period

The court in *Cammer* noted that S-3 registration is indicative of market efficiency. *See* 711 F. Supp. at 1284-85. A company is eligible for S-3 registration – as opposed to a more onerous S-1 or S-2 registration – if it has filed SEC reports continuously for at least 12 consecutive months and satisfies a minimum public "float" requirement (i.e., the combined value of shares held by the public) of $75 million.[6] The SEC has explained that the market tends to operate efficiently for companies that meet the minimum reporting and float requirements, and thus these companies are permitted to file abbreviated registration statements by incorporating old SEC documents into registration statements by reference. *See id*.

At all relevant times, Hospira was eligible to file on SEC Form S-3, supporting a finding of market efficiency. *See* Finnerty Decl. ¶¶27-28.

---

[6] When *Cammer* was decided, companies could use the S-3 Registration Form only if they had filed SEC reports continuously for 36 months and had at least $150 million in public float. *See Teamsters Local 445*, 2006 U.S. Dist. LEXIS 52991, at *35 n.95. Since *Cammer*, the SEC has reduced these minimums. Now, a company must only have $75 million in public float and have filed reports with the SEC for 12 consecutive months. *See id*. at *35.

(5)     **There Is a Causal Relationship Between
        Unexpected Events and an Immediate Response
        in Hospira's Stock Price**

Market efficiency is also supported by the fact that "unexpected corporate events or financial releases" regarding Hospira immediately affected its stock price. *Cammer,* 711 F. Supp. at 1287.[7] During the Class Period, Hospira's stock price dropped in response to a series of unexpected disclosures regarding the fraudulent scheme alleged in the Complaint. *See* ¶¶248-63; Finnerty Decl. ¶¶52-58. For example, on October 18, 2011, the Company announced disappointing third quarter 2011 financial results and a bleaker outlook due to production issues attributable to remediation efforts at Rocky Mount and other QC problems. *See* ¶¶254-55; Finnerty Decl. ¶¶55-58. Investors and analysts were shocked by this news, and as a direct result, Hospira's stock value immediately dropped by approximately 21% on the day of the announcement. *See* ¶255; Finnerty Decl. ¶57. Dr. Finnerty's Modified Fama-French Three-Factor Model identified an abnormal return resulting from this news announcement of -22.49%, which is statistically significant at the 1% level, meaning that there is less than a 1-in-100 chance that the abnormal return happened by mere chance. *See* Finnerty Decl. ¶57.[8]

---

[7]     As the Supreme Court recently held, plaintiffs are not required to prove loss causation (i.e., that the revelation of defendants' fraud proximately caused plaintiffs to suffer a loss). Simply put, "[l]oss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory." *Halliburton*, 131 S. Ct. at 2186.

[8]     In addition to the five *Cammer* factors, some courts have also looked at the three factors enumerated in *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001), to evaluate market efficiency. *See, e.g.*, *Billhofer v. Flamel Tech., S.A.*, 281 F.R.D. 150, 159-60 (S.D.N.Y. 2012) (applying both the *Cammer* factors and *Krogman* factors to analyze market efficiency). The three *Krogman* factors are: (1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the degree to which shares of the security are held by the public, rather than by insiders, also known as the company's "float." *See id.* Hospira common stock met each of the *Krogman* factors during the Class Period, further supporting a finding of market efficiency. *See* Finnerty Decl. ¶¶59-66. In addition, the level of short interest in Hospira common stock further supports the stock's market efficiency. *See id.* ¶¶67-68.

In sum, Lead Plaintiffs have presented sufficient data establishing that the market for Hospira shares during the Class Period was well-developed and efficient, and therefore the market price of Hospira shares reflected publicly available information concerning Hospira. The Class is therefore entitled to a common presumption of reliance under the fraud-on-the-market doctrine.[9]

## 2.  A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy

In addition to the predominance of common questions, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." This "superiority" determination takes the following factors into account: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

Courts in this Circuit have recognized the clear superiority of the class action mechanism for adjudication of securities actions. *See, e.g.*, *Tatz*, 2003 U.S. Dist. LEXIS 9982, at *29 ("Rule 23 was designed for this exact type of case [a securities action]."); *Levitan*, 2003 U.S. Dist. LEXIS 5078, at *21 (same); *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *24 (same). In securities cases, a class action is superior to any alternative because: (1) absent a class action, defendants and the courts face potentially thousands of individual lawsuits, all arising out of the same set of operative facts; (2) the resolution of common issues alleged in one class action will result in efficient use of judicial resources and a single outcome that is binding on all defendants and class members; (3) any administrative difficulties in handling potential individual issues that may arise are less burdensome

---

[9]  The presumption of reliance also applies to a case, like this, which involves omissions of material facts which defendants had a duty to disclose. *See Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 153-54 (1972); *Wright v. Heizer Corp.*, 560 F.2d 236, 249-50 (7th Cir. 1977).

than the problems which are likely to arise in administering hundreds or thousands of separate actions; and (4) because of the prohibitive expenses of maintaining individual actions, denial of class certification would effectively prevent numerous individuals from asserting their claims against defendants and severely weaken the protections provided to investors under the federal securities laws.

All of these factors are particularly relevant to the instant case. Defendants' alleged securities violations caused economic injury to large numbers of geographically dispersed Class members, making the cost of pursuing individual claims plainly impracticable. *See* Finnerty Decl. ¶20 (noting an average of 166 million Hospira shares outstanding during the Class Period). The litigation of this controversy as a class action will adequately protect the interests of the Class. In contrast, the "alternative" to a class action – potentially thousands of separate individual actions – offers no practical recourse for most Class members, and would indisputably burden the judicial system.

### D. The Court Should Appoint Co-Lead Counsel as Class Counsel Under Rule 23(g)

Rule 23(g)(1) provides that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." As discussed above, Motley Rice and Robbins Geller have worked vigorously to prosecute this action and are highly experienced in successfully handling securities fraud and other complex class action litigation. *See* Exs. J, K (firm résumés of Motley Rice and Robbins Geller). Lead Plaintiffs respectfully request that Motley Rice and Robbins Geller be appointed Class Counsel here.

### V. CONCLUSION

For all of the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (1) certify this action as a class action pursuant to Rules 23(a) and 23(b)(3); (2) appoint Lead Plaintiffs as Class

representatives for the proposed Class; (3) appoint Motley Rice and Robbins Geller as Class Counsel; and (4) grant such further relief as the Court deems just and proper.[10]

---

[10] Consistent with this Court's Case Management Procedures, attached hereto as composite Ex. L are copies of decisions relied upon herein that are only published on electronic database.

DATED: August 12, 2013                      ROBBINS GELLER RUDMAN
   & DOWD LLP
PAUL J. GELLER
JACK REISE (*pro hac vice*)
JESSE S. JOHNSON (*pro hac vice*)


*/S/ JACK REISE*
JACK REISE

120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com
jjohnson@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com

MOTLEY RICE LLC
JOSEPH F. RICE
JAMES M. HUGHES
VINCENT I. PARRETT
BADGE HUMPHRIES
DAVID P. ABEL
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jrice@motleyrice.com
jhughes@motleyrice.com
vparrett@motleyrice.com
bhumphries@motleyrice.com
dabel@motleyrice.com

**Co-Lead Counsel for Plaintiffs**

24

## <u>CERTIFICATE OF SERVICE</u>

I, Jack Reise, one of Lead Plaintiffs' attorneys, hereby certify that on August 12, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties listed on the electronic service list.


*/S/ JACK REISE*

JACK REISE